IN RE INTEREST OF L. V., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. W. V., APPELLANT.

482 N.W.2d 250

Filed April 3, 1992.   No. S-91-716.

Bernard J. Ach for appellant.

Chris Horacek, Deputy Saline County Attorney, for appellee.

Vicky L. Johnson, guardian ad litem.

Hastings, C.J., Boslaugh, White, Caporale, Shanahan, Grant, and Fahrnbruch, JJ.

SHANAHAN, J.

W.V., biological father of L.V., appeals from the judgment of the county court for Saline County, sitting as a juvenile court pursuant to Neb. Rev. Stat. § 43-245 (Cum. Supp. 1990), which terminated W.V.'s parental rights concerning L.V. Termination was based on Neb. Rev. Stat. § 43-292(1) (Reissue 1988) (abandonment of a juvenile for at least 6 months immediately before the filing of a petition to terminate parental rights), § 43-292(2) (substantial and continuous or repeated neglect of a juvenile and refusal to provide parental care and protection for the juvenile), and the court's conclusion that termination of parental rights was in L.V.'s best interests. L.V.'s biological mother entered her voluntary appearance in the proceedings, but is not involved in this appeal. We affirm.

## STANDARD OF REVIEW

In an appeal from a judgment terminating parental rights, an appellate court tries factual questions de novo on the record, which requires an appellate court to reach a conclusion independent of the findings of the trial court, but, when evidence is in conflict, an appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another.

*In re Interest of M.P.*, 238 Neb. 857, 858-59, 472 N.W.2d 432, 434 (1991). Accord, *In re Interest of A.H.*, 237 Neb. 797, 467 N.W.2d 682 (1991); *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987); *In re Interest of T.C.*, 226 Neb. 116, 409 N.W.2d 607 (1987).

The unequivocal language of § 43-292 imposes two requirements before parental rights may be terminated. First, requisite evidence must establish existence of one or more of the circumstances described in subsections (1) to (6) of § 43-292. Second, if a circumstance designated in subsections (1) to (6) is evidentially established, there must be the additional showing that the termination of parental rights is in the best interests of the child, the primary consideration in any question concerning termination of parental rights. The standard of proof for each of the two

preceding requirements prescribed by § 43-292 is evidence which is "clear and convincing."
*In re Interest of J.S., A.C., and C.S.*, 227 Neb. at 267, 417 N.W.2d at 158. Accord, *In re Interest of M.P., supra*; *In re Interest of T.C., supra*.

"In the absence of any reasonable alternative and as the last resort to dispose of an action brought pursuant to the Nebraska Juvenile Code . . . termination of parental rights is permissible when the basis for such termination is proved by clear and convincing evidence." *In re Interest of T.C.*, 226 Neb. at 117, 409 N.W.2d at 609. Accord, *In re Interest of J.S., A.C., and C.S., supra*; *In re Interest of M.P., supra*. " '[C]lear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved.' " *In re Interest of J.S., A.C., and C.S.*, 227 Neb. at 266, 417 N.W.2d at 157 (quoting from *Castellano v. Bitkower*, 216 Neb. 806, 346 N.W.2d 249 (1984)).

## PROCEDURAL BACKGROUND FOR TERMINATION HEARING

*Adjudication.*

The child, L.V., was born on August 10, 1977, of her mother's marriage to W.V. As a result of a marital dissolution decree in 1979, the mother received custody of L.V. However, at an adjudication hearing in 1988, the court determined that L.V. was a juvenile in a situation which was dangerous to her life or limb or was injurious to her health or morals. See Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1988) (jurisdiction of juvenile courts). L.V.'s custody was thereafter placed with the Nebraska Department of Social Services (DSS). No appeal was taken from the adjudication.

*Petition to Terminate W.V.'s Parental Rights.*

On August 31, 1990, the State filed a petition to terminate W.V.'s parental rights concerning L.V. Among the bases for its petition, the State alleged W.V.'s 6-month abandonment of L.V., see § 43-292(1), and his failure to provide parental care and protection for L.V., see § 43-292(2).

When notified of the termination hearing, W.V. was

incarcerated in the state penitentiary at Kyle, Texas, where he had served approximately 8 years of his 25-year sentence for aggravated sexual assault of a 6-year-old victim. In reference to the prospective hearing, W.V. filed a motion asserting that his "mandatory supervision release date" from the Texas penitentiary was December 8, 1991, and, therefore, requesting that the termination proceeding be postponed until W.V. might be physically present at the termination hearing. After counsel's argument on the motion, the court, on October 10, 1990, concluded: "There is no due process requirement for [W.V.] to be personally present" at the termination hearing, which eventually took place on December 20. However, the court ordered that on completion of the State's evidence at the December 20 hearing, the proceeding would be recessed, testimony from the State's witnesses would be transcribed, and the county attorney, W.V.'s lawyer, and L.V.'s guardian ad litem would then proceed to Texas at state expense and obtain W.V.'s deposition in light of the transcription. Also, the court ordered that W.V., after his examination of the transcribed testimony given at the December 20 hearing and on resumption of the termination hearing, would be allowed to recall any of the State's witnesses for further cross-examination and call his own witnesses. Although the record indicates that W.V.'s deposition was not taken, the transcription of the December 20 hearing, at which W.V. was represented by a lawyer, was filed with the court on January 10, 1991. W.V.'s lawyer sent a copy of the transcript to W.V. in Texas. W.V. examined the transcript and corresponded with his lawyer about some aspects of the testimony at the hearing of December 20, 1990. There is no complaint that W.V.'s deposition was not obtained in accordance with the order of October 10, 1990.

## TERMINATION HEARING

The termination hearing resumed on May 13, 1991, although W.V. was still incarcerated in Texas. However, by telephone, W.V., who was sworn in in the presence of his Texas lawyer, listened to and participated in the resumed termination hearing, at which W.V. was represented by a lawyer in Nebraska.

According to the transcription of the December 20, 1990,

hearing and evidence adduced at the resumed termination hearing, W.V.'s presence and involvement in L.V.'s life was sparse. For instance, in March 1978, when L.V. was a little over 6 months old, W.V. began serving a sentence in the Nebraska Penal and Correctional Complex, and was released in November 1978, but visited L.V. only once during 1978. In October 1979, W.V. reentered the Nebraska penitentiary, where he served his sentence until discharged in June 1980. W.V. remained in the Lincoln area and had sporadic employment, but very little personal contact with L.V. In October 1982, W.V. moved to Texas without supplying L.V. or her mother with information about his departure, destination, or whereabouts in Texas. Within 1 week after his arrival in Texas, W.V. was arrested on a charge of aggravated sexual assault on a 6-year-old child and was later convicted in a jury trial and sentenced to 25 years' imprisonment for that conviction. W.V. sent L.V. a Christmas card in 1983.

L.V. testified that she does not recall seeing W.V. in person and does not remember any type of contact with him, such as letters or phone calls, before 1988, when she was in custody of DSS. After 1988, while she was in custody of DSS, L.V. received two or three telephone calls from W.V. Also, W.V. sent L.V. cards and letters, as well as some gifts; for example, a jewelry box made from matchsticks, $10 on two occasions, a framed picture of W.V., and a painting by W.V. At the termination hearing on December 20, 1990, L.V., who was then 13 years old, stated that she does not want to see W.V. or develop any relationship with him, because "he was never there when I was growing up."

Dr. Scott Moore, a psychiatrist, examined L.V. three times during the year preceding the initial part of the termination hearing. According to Dr. Moore, L.V.'s conduct was consistent with an "adjustment disorder with mixed emotional and behavioral response," that is, a condition which is

the result of experiences that the person has gone through rather than being a basic innate mental disorder of some type.

I think that [L.V.'s] problems — current problems result from the environmental factors that have impinged upon

her rather than because she has some biochemical abnormality of the brain.

Dr. Moore further testified that L.V. is experiencing behavioral and emotional problems, because she "has been abandoned in the mind of a child by losing her family." Contributing to L.V.'s feeling of abandonment is the fact that she does not know who W.V. is,

> has never met him, has had no contact with him in terms of what you and I would think of as contact. But at the same time she is told this is her father. She doesn't believe that . . . [and] my feeling is that contact with a man who is known to her to have forcibly sexually assaulted another young girl will flood back into her all of the things that happened to her all over again and in great measure may put her back to ground zero again.

Consequently, Dr. Moore stated, "It is my opinion it is in [L.V.'s] best interest to discontinue entirely and permanently any kind of relationship with W.V." In response to a question about L.V.'s receipt of cards and letters from W.V., Dr. Moore explained,

> [I]t's been my observation that frequently those who commit sexual crimes attempt to atone for that by expressions of love for people who either they have abused or who were not part of the abuse, but might be expected to somehow bolster their own feeling that they're really not a bad guy after all.

A counselor with the Child Guidance Center who has been associated with L.V. for 2 years testified that she has seen L.V. approximately 150 times in various counseling sessions. The counselor expressed the opinion that it was in L.V.'s best interests that W.V.'s parental rights be terminated, because, in the counselor's words:

> I believe that his history and the fact that they have no current relationship, it would set her up to be hurt again and that there is no evidence that this man could parent her and would be in any way trustworthy to have her in his care. So, it would be just a set up for her to be abandoned once again.

W.V. telephonically participated in the resumed termination

hearing and expressly acknowledged that he had received and examined a copy of the transcribed testimony from the hearing in December 1990. In fact, W.V. had the transcription in front of him during the hearing on May 13, 1991. W.V. verified that he had been incarcerated in Nebraska from March 1978 to November of that year and from October 1979 through June 1980 and that he has been imprisoned in Texas since October 1982. While W.V. was in Lincoln after his discharge from prison in 1980, he had various jobs, but contributed only $100 or $200 as support for his family, including L.V. In his testimony, W.V. admitted that he had not personally seen L.V. since 1981. After 1988, he had telephoned L.V. twice, in calls which lasted "between five to seven minutes," and had written to her on occasion. Finally, W.V. expects to be under the supervision of the Texas department of correctional services, either as a prison inmate or under mandatory supervised release, until the year 2007. As W.V. expressed the situation, "I don't really expect to be anywhere around the children anytime real soon. I don't know, it's going to be a while to . . . get back up there . . . because I'm going to have to get everything squared away with Texas . . . ."

After his telephonic participation in the termination hearing, W.V. did not recall any witness who had previously testified at the hearing in December 1990 and did not call any other witnesses; therefore, the hearing was concluded.

The court determined that the evidence clearly and convincingly established that W.V. "has abandoned [L.V.] throughout her entire life [and] has neglected [L.V.] and failed to provide necessary parental care and protection" since at least November 1982. The court also found "it is beyond a reasonable doubt in the best interests of [L.V.] that the parental rights of [W.V.] be terminated."

## ASSIGNMENTS OF ERROR

First, W.V. alleges that he was denied procedural due process in the termination hearing, when the court refused a postponement so that W.V. might physically attend the hearing. Second, W.V. claims that the evidence is insufficient to justify termination of his parental rights concerning L.V.

## PROCEDURAL DUE PROCESS

W.V. contends that he, as L.V.'s biological father, is constitutionally entitled to his personal attendance at a hearing to terminate parental rights, and, consequently, denial of his request to attend the termination hearing is a violation of due process.

We recognize that the parent-child relationship is afforded due process protection. See, *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981); *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *Quilloin v. Walcott*, 434 U.S. 246, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978); *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991).

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

*Santosky v. Kramer*, 455 U.S. at 753-54.

Consequently, procedural due process is applicable to a proceeding for termination of parental rights. See, *In re Interest of A.H.*, 237 Neb. 797, 467 N.W.2d 682 (1991); *In re Interest of D.S. and T.S.*, 236 Neb. 413, 461 N.W.2d 415 (1990); *In re Interest of J.L.M. et al.*, 234 Neb. 381, 451 N.W.2d 377 (1990); *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987).

As the U.S. Supreme Court observed in *Smith v. Organization of Foster Families*, 431 U.S. 816, 847-48, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977):

> Where procedural due process must be afforded because a "liberty" or "property" interest is within the

Fourteenth Amendment's protection, there must be determined "what process is due" in the particular context. . . .

. . . "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 405 U. S. 471, 481 (1972).

The concept of due process embodies the notion of fundamental fairness and defies precise definition, or, as the U.S. Supreme Court noted:

For all its consequences, "due process" has never been, and perhaps can never be, precisely defined. "[U]nlike some legal rules," this Court has said, due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers v. McElroy*, 367 U. S. 886, 895. Rather, the phrase expresses the requirement of "fundamental fairness," a requirement whose meaning can be as opaque as its importance is lofty. Applying the Due Process Clause is therefore an uncertain enterprise which must discover what "fundamental fairness" consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake.

*Lassiter v. Department of Social Services*, 452 U.S. at 24-25.

Since due process is applicable and adaptable to various situations and, therefore, necessarily and inherently flexible, adaptability and flexibility of due process should not be mistaken for, or equated with, an absence of minimal procedural protection against a governmental attempt to restrict or eliminate personal rights guaranteed by the Constitutions. As stated in *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972): "For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard . . . .' " When a person has a right to be heard, procedural due process includes notice to the person whose right is affected by a proceeding, that is, timely notice reasonably calculated to inform the person concerning the subject and issues involved in the proceeding; a reasonable opportunity to refute or defend against a charge or accusation; a reasonable opportunity to

confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by constitution or statute; and a hearing before an impartial decisionmaker. See, *Fuentes v. Shevin, supra*; *Goldberg v. Kelly*, 397 U.S. 254, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970); *In re Appeal of Levos*, 214 Neb. 507, 335 N.W.2d 262 (1983); *State v. Kingery*, 239 Mont. 160, 779 P.2d 495 (1989); *Hladys v. Commonwealth*, 235 Va. 145, 366 S.E.2d 98 (1988); *In re Griffith*, 304 Or. 575, 748 P.2d 86 (1987); *Schexnider v. Blache*, 504 So. 2d 864 (La. 1987); *In re Nelson*, 78 N.M. 739, 437 P.2d 1008 (1968); *People v. Acevedo*, 216 Ill. App. 3d 195, 576 N.E.2d 949 (1991).

## PHYSICAL ATTENDANCE AT A HEARING TO TERMINATE PARENTAL RIGHTS

In the present case, for the first time in Nebraska, we are asked to decide whether procedural due process requires a parent's physical presence at a hearing to terminate parental rights.

In *Caynor v. Caynor*, 213 Neb. 143, 144-45, 327 N.W.2d 633, 635 (1982), this court stated, "A prison inmate has no absolute constitutional right to be released from prison so that he can be present at a hearing in a civil action . . . ." Similarly, in *State v. Otey*, 212 Neb. 103, 104-05, 321 N.W.2d 453, 454 (1982), we reaffirmed that "although a prisoner could not be prevented from testifying in support of his [postconviction] motion, he [has] no right to be personally present at an evidentiary hearing on the motion." See, also, *State v. Woods*, 180 Neb. 282, 142 N.W.2d 339 (1966).

In *In re Interest of F. H.*, 283 N.W.2d 202, 209 (N.D. 1979), the Supreme Court of North Dakota addressed the question whether a prison inmate had a procedural due process right to physical attendance at a hearing for termination of the prisoner's parental rights and stated:

[W]e are compelled to conclude that a convict does not have a constitutional right to personally appear in a civil suit where he has been permitted to appear through counsel and by deposition, if appropriate. Any right to appear personally would have to rest upon convincing

reasons and would ultimately be left to the sound discretion of the trial court.

In making its determination the trial court may take into account the costs and inconvenience of transporting a prisoner from his place of incarceration to the courtroom, any potential danger or security risk which the presence of a particular inmate would pose to the court, the substantiality of the matter at issue, the need for an early determination of the matter, the possibility of delaying trial until the prisoner is released, the probability of success on the merits, the integrity of the correctional system, and the interests of the inmate in presenting his testimony in person rather than by deposition.

As an additional factor in cases involving termination of parental rights, the North Dakota court noted that in the "interest of the child," the proceeding "should not drag on" indefinitely. *Id*. at 210.

Several other courts have concurred with the reasoning for the result reached in *In re Interest of F. H., supra*; for example, *In re Juvenile Appeal*, 187 Conn. 431, 446 A.2d 808 (1982) (parent incarcerated outside the state was afforded procedural due process in a parental rights termination proceeding when a transcript of the state's evidence was sent to the prisoner parent for review and the parent later testified telephonically and had the opportunity to cross-examine witnesses for the state); *Matter of Welfare of HGB*, 306 N.W.2d 821 (Minn. 1981) (a parent incarcerated outside the state was afforded procedural due process in a parental rights termination proceeding when the parent was represented by court-appointed counsel who appeared at the termination hearing); *In re Interest of J.S.*, 470 N.W.2d 48 (Iowa App. 1991) (procedural due process in a parental rights termination proceeding is satisfied when an incarcerated parent receives notice of the hearing for termination of parental rights, is represented by counsel, and has the opportunity to present depositional testimony for the termination hearing); *State in Interest of M.A.V. v. Vargas*, 736 P.2d 1031 (Utah App. 1987) (telephonic participation with assistance of counsel satisfies procedural due process in a proceeding to terminate parental rights); *Pignolet v. State*

*Dept. of Pensions & Sec.*, 489 So. 2d 588 (Ala. Civ. App. 1986) (procedural due process was afforded a parent in a proceeding to terminate parental rights when the parent received notice of the hearing, was given the opportunity to be heard through a deposition, and was represented by counsel); *In re Darrow*, 32 Wash. App. 803, 649 P.2d 858 (1982) (due process was afforded a parent, incarcerated outside the forum state in which a parental rights termination hearing was held, when the parent received notice of the termination hearing, had the opportunity to appear by deposition, and was represented by counsel).

After our consideration of the foregoing decisions and the judicial reasoning expressed in those opinions, we conclude and hold that parental physical presence is unnecessary for a hearing to terminate parental rights, provided that the parent has been afforded procedural due process for the hearing to terminate parental rights.

If a parent has been afforded procedural due process for a hearing to terminate parental rights, allowing a parent who is incarcerated or otherwise confined in custody of a government to attend the termination hearing is within the discretion of the trial court, whose decision on appeal will be upheld in the absence of an abuse of discretion. In deciding whether to allow a parent's attendance at a hearing to terminate parental rights, notwithstanding the parent's incarceration or other confinement, a court may consider the delay resulting from prospective parental attendance, the need for disposition of the proceeding within the immediate future, the elapsed time during which the proceeding has been pending before the juvenile court, the expense to the State if the State will be required to provide transportation for the parent, the inconvenience or detriment to parties or witnesses, the potential danger or security risk which may occur as a result of the parent's release from custody or confinement to attend the hearing, the reasonable availability of the parent's testimony through a means other than parental attendance at the hearing, and the best interests of the parent's child or children in reference to the parent's prospective physical attendance at the termination hearing.

In light of the foregoing, we now determine (1) whether the

trial court afforded W.V. procedural due process in the proceeding to terminate W.V.'s parental rights and (2) whether the court abused its discretion in disallowing W.V.'s physical attendance at the termination hearing.

W.V. received notice of the termination hearing and was represented by counsel throughout that proceeding. Also, before the termination hearing, W.V. was notified of the specific accusations against him, namely, his abandonment of L.V. and his continued or repeated neglect or refusal to provide parental care and protection for L.V. Regarding the termination hearing, W.V. was given the opportunity to recall and cross-examine witnesses for the State and to call witnesses on his behalf. Actually, as a result of the transcribed testimony, examined by W.V. apparently several months before the resumed termination hearing, W.V. was afforded an opportunity greater than that usually available to other litigants, who are required to cross-examine a witness contemporaneously with direct examination of the witness. W.V. telephonically participated in the resumed termination hearing. Through that telephonic communication, W.V. presented evidence on the accusations against him. In the final analysis, we conclude that W.V. was afforded procedural due process regarding the hearing to terminate his parental rights. However, we hasten to add that the procedure utilized by the county court surpassed the requirements of procedural due process applicable to W.V.'s case; hence, the procedure used in W.V.'s case should not be construed as *the* standard to determine procedural due process for one who has a constitutional right to be heard in a proceeding.

> [A] judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from action, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system.

*State v. Juhl*, 234 Neb. 33, 43, 449 N.W.2d 202, 209 (1989). Accord, *Stewart v. Amigo's Restaurant, ante* p. 53, 480 N.W.2d 211 (1992); *State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990); *Wachtel v. Beer*, 229 Neb. 392, 427 N.W.2d

56 (1988); *Newton v. Brown*, 222 Neb. 605, 386 N.W.2d 424 (1986).

In light of the factors which we have set out above concerning a parent's physical attendance at a parental rights termination hearing, notwithstanding the parent's incarceration or confinement in custody of a government, we cannot conclude that the county court abused its discretion in disallowing W.V.'s physical attendance at the termination hearing. Accordingly, W.V.'s first assignment of error is without merit.

## SUFFICIENCY OF EVIDENCE

Next, W.V. contends that the evidence is insufficient to sustain the trial court's finding that W.V.'s parental rights should be terminated.

Although parental rights may not be terminated solely for a parent's incarceration, parental incarceration is a factor which may be considered in determining whether parental rights should be terminated. See, *In re Interest of B.A.G.*, 235 Neb. 730, 457 N.W.2d 292 (1990); *In re Interest of R.T. and R.T.*, 233 Neb. 483, 446 N.W.2d 12 (1989); *In re Interest of Wagner and Russell*, 209 Neb. 33, 305 N.W.2d 900 (1981); *In re Interest of Ditter*, 212 Neb. 279, 322 N.W.2d 642 (1982); *In re Interest of Reed*, 212 Neb. 208, 322 N.W.2d 411 (1982).

> Incarceration of a parent, standing alone, does not furnish a ground for automatic termination of parental rights. . . . Incarceration, however, does not insulate an inmate from the termination of his parental rights if the record contains the clear and convincing evidence that would support the termination of the rights of any other parent.

*In re Randy Scott B.*, 511 A.2d 450, 455 (Me. 1986).

Several other courts have concluded that a parent's incarceration may be considered in determining whether parental rights should be terminated; for example, *In re Pawling*, 101 Wash. 2d 392, 679 P.2d 916 (1984) (parent's incarceration, conduct resulting in incarceration, and person against whom criminal act committed are factors to be considered in determining whether to terminate parental

rights); *In re Welfare of Staat*, 287 Minn. 501, 178 N.W.2d 709 (1970) (incarceration may combine with other factors, such as neglect and withholding of parental affection, to support termination of parental rights); *In re Interest M.L.K.*, 804 S.W.2d 398 (Mo. App. 1991) (parental rights may be terminated while a parent is incarcerated, when the parent fails to maintain a continuing relationship with the child); *Matter of Delores B.*, 141 A.D.2d 100, 533 N.Y.S.2d 706 (1988) (incarceration and conduct leading to incarceration may be considered for termination of parental rights); *In re Juvenile Appeal*, 2 Conn. App. 705, 483 A.2d 1101 (1984) (incarceration and conduct which resulted in incarceration may be considered in proceeding to terminate parental rights); *Matter of Adoption of Doe*, 99 N.M. 278, 657 P.2d 134 (1983) (incarceration coupled with other factors such as neglect, lack of affection, failure to maintain a relationship, and failure to provide financial support for a child may be considered concerning termination of parental rights); *In re Brannon*, 340 So. 2d 654 (La. App. 1977) (incarceration may be considered in relation to a parent's failure to provide for the child).

Section 43-292(1) provides that the court may terminate parental rights when the parent has "abandoned the juvenile for six months or more immediately prior to the filing of the petition" to terminate parental rights. " 'Abandonment,' for the purpose of § 43-292(1), is a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and opportunity for the display of parental affection for the child." *In re Interest of J.L.M. et. al.*, 234 Neb. 381, 398, 451 N.W.2d 377, 388 (1990). Accord, *In re Interest of C.A.*, 235 Neb. 893, 457 N.W.2d 822 (1990); *In re Interest of A.G.G.*, 230 Neb. 707, 433 N.W.2d 185 (1988). "The question of abandonment is largely one of intent, to be determined in each case from all of the facts and circumstances." *In re Interest of B.A.G.*, 235 Neb. at 735, 457 N.W.2d at 296. Accord *In re Interest of A.G.G., supra*.

This court, in *In re Interest of R.T. and R.T.*, 233 Neb. 483, 446 N.W.2d 12 (1989), considered a mother's incarceration for theft and stated, "[W]hile the fact of incarceration was

involuntary as far as [the mother] was concerned, her illegal activities leading to incarceration were voluntary on [her] part." 233 Neb. at 487, 446 N.W.2d at 16.

Several courts considering a parent's incarceration in relation to abandonment as a ground for terminating parental rights have concluded that parental incarceration may be considered in reference to abandonment as a basis for termination of parental rights. In *In re Pawling*, 101 Wash. 2d 392, 679 P.2d 916 (1984), the Supreme Court of Washington reviewed a judgment that terminated a father's parental rights on the ground of abandonment as a result of the father's incarceration in the Washington State Penitentiary, where the father was serving a sentence of 37 years for burglary and rape. Noting that the applicable Washington statute defined "abandonment" as "a wilful substantial lack of regard for parental obligations," the Washington court stated:

Obviously, incarceration hinders the ability of a parent to fulfill [parental] obligations. [Citation omitted.]

Neither criminal conduct nor imprisonment alone necessarily justifies an order of permanent deprivation. [Citations omitted.] However, in termination proceedings we do consider "a parent's inability to perform his parental obligations because of imprisonment, the nature of the crime committed, as well as the person against whom the criminal act was perpetrated are all relevant to the issue of parental fitness and child welfare, as [is] the parent's conduct prior to imprisonment and during the period of incarceration." *In re Sego*, [82 Wash. 2d 736, 513 P.2d 831 (1973)].

. . . .

. . . [W]e affirm the trial court and hold appellant did in fact abandon [his child] "under circumstances showing a wilful substantial lack of regard for parental obligations." The trial court did not rely solely on the fact appellant is incarcerated. . . . Rather, all relevant circumstances were evaluated. The fact appellant intended and continued to commit criminal acts, which resulted in incarceration, became the equivalent of abandonment. Moreover, appellant failed to meet parental obligations. He has not

expressed "love and affection", "personal concern", or "social and religious guidance" to [the child] for over 5 years. . . . He has supplied negligible financial support for his son and the prospects of his doing so in the future are questionable. The termination order is sustained by clear, cogent, and convincing evidence.

101 Wash. 2d at 397-98, 400, 679 P.2d at 919-21.

In *Hutson v. Haggard*, 475 S.W.2d 330 (Tex. 1971), the court considered the contention that a parent's imprisonment for 2 years should not be considered in reference to abandonment. Hutson, the appellant, was serving a sentence for 10 to 25 years for armed robbery. In concluding that abandonment had been proved, the court stated:

It was appellant's voluntary acts which brought about his confinement in the penitentiary. There is no hint in our record that anyone other than appellant was in any degree responsible for appellant's inability to visit with his child or to contribute to her support. Only his course of criminal conduct has prevented his exercising parental authority or making any parental contribution to the child since she was nine months old. He will not even be eligible for a review of his sentence for another three years.

. . . [W]e are of the opinion that appellant's wilful criminal acts and course of conduct has been such as implies a conscious disregard and indifference to [the child] in respect to his parental obligations that he as a parent owed to her. Thus, we reject the contention that imprisonment does not constitute voluntary abandonment . . . .

475 S.W.2d at 333. See, also, *Matter of Adoption of Doe*, 99 N.M. 278, 282, 657 P.2d 134, 138 (1983):

Not every act of a parent which results in incarceration, nor every criminal act perpetrated between parents, can be deemed to be abandonment as a matter of law. Abandonment rests upon incarceration coupled with other factors such as parental neglect, lack of affection shown toward the child, failure to contact the child, financially support the child if able to do so, as well as disregard for the general welfare of the child.

See, also, *Matter of B. A. M.*, 290 N.W.2d 498 (S.D. 1980); *State in Interest of M. W.H. v. Aguilar*, 794 P.2d 27 (Utah App. 1990); *In Interest of B.A.F.*, 783 S.W.2d 932 (Mo. App. 1989); *Matter of I.R.*, 153 A.D.2d 559, 544 N.Y.S.2d 216 (1989); *Matter of C.P.*, 103 N.M. 617, 711 P.2d 894 (N.M. App. 1985); *Matter of Moyer*, 42 Or. App. 655, 601 P.2d 821 (1979).

Consequently, we now hold that parental incarceration may be considered in reference to abandonment as a basis for termination of parental rights under § 43-292(1).

Although W.V.'s incarceration is likely not a matter of his choice alone, since the people of Texas have expressed their voice in determining his location for some time to come, we cannot ignore the fact that the conduct which led to W.V.'s Texas incarceration was voluntary and intentional in the aggravated sexual assault of a 6-year-old victim. See Texas Penal Code Ann. § 22.021 (West 1989) (aggravated sexual assault). When W.V. committed the criminal act for which he is serving a lengthy sentence in Texas, his conduct had a bearing on the question of abandonment of L.V., whom he had left behind in Nebraska. W.V.'s incarceration in Texas furnishes no justification or excuse for W.V.'s failure in parental obligations to L.V. The same can be said about W.V.'s two prison terms served in Nebraska, because we view neither Nebraska sentence as justification or an excuse for W.V.'s absence from L.V.'s life and his failure to provide care, love, protection, and maintenance for his daughter. We point out the paltry child support, at the most $200, supplied by W.V. when he was outside prison. Moreover, after his discharge from prison in Nebraska and his surreptitious departure from the state, W.V. embarked on despicable conduct in Texas, an intentional act which evidenced disregard for the parent-child relationship and welfare of L.V. in Nebraska, not to mention the effect of his conduct on the welfare of the child victim in Texas. W.V.'s conscious decisions supply circumstances for the conclusion that he had abandoned L.V. Therefore, from our de novo review of the record, we find that the evidence clearly and convincingly establishes that W.V. abandoned L.V. for a period of at least 6 months before the State filed its petition to terminate his parental rights. See § 43-292(1).

Moreover, considering all aspects of W.V.'s intentional conduct in both Nebraska and Texas, we find, from our de novo review, that the evidence clearly and convincingly establishes that W.V. has substantially and continuously or repeatedly neglected L.V. and has refused to provide parental care and protection for her, all without any justifiable reason or excuse for such parental failure. See § 43-292(2).

Consequently, in our de novo review, we find, by evidence which is clear and convincing, that W.V.'s parental rights concerning L.V. must be terminated, as authorized by § 43-292(1) and (2) of the Nebraska Juvenile Code.

Finally, from our de novo review, we find, by clear and convincing evidence, that W.V.'s parental rights must be terminated in the best interests of L.V. Hence, W.V.'s second assignment of error is without merit.

Our independent conclusion, reached as a result of our de novo review, coincides with the findings by the trial court. For that reason, the judgment of the trial court is affirmed.

AFFIRMED.