IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

IN RE INTEREST OF GARY L. & LEANNA L.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF GARY L. AND LEANNA L.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,
V.
TERESA L., APPELLANT.

Filed September 3, 2013.    No. A-12-1110.

Appeal from the Separate Juvenile Court of Douglas County: CHRISTOPHER KELLY, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Zoë R. Wade for appellant.

Donald W. Kleine, Douglas County Attorney, Amy Schuchman, and Emily H. Anderson, Senior Certified Law Student, for appellee.

MOORE and PIRTLE, Judges, and MULLEN, District Judge, Retired.

PIRTLE, Judge.

INTRODUCTION

Teresa L. appeals from the order terminating her parental rights entered by the separate juvenile court of Douglas County on October 29, 2012. For the reasons that follow, we affirm.

BACKGROUND

Teresa L. is the mother of Gary L. and Leanna L. In 2006, Gary and Leanna became state wards and were placed in foster care because they were living in a dirty home. Teresa voluntarily worked with the Department of Health and Human Services, and the children were returned to Teresa's home in 2009.

- 1 -

On July 23, 2010, the State filed a petition establishing that Gary and Leanna were children within Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) due to the faults and habits of Teresa. The petition alleged that law enforcement observed the residence to have crawling and airborne insects; Teresa admitted to using drugs and "having drug equipment in the bedroom"; Teresa's use of alcohol and/or controlled substances put the children at risk for harm; Teresa failed to provide safe, stable, and appropriate housing; Teresa failed to provide proper parental care, support, and/or supervision; and the children are at risk for harm.

The State also filed a motion for temporary custody for the removal of the minor children from Teresa's home, which motion was granted by the juvenile court. The court found it would be contrary to the health, welfare, and safety of the children to remain in the parental home and ordered the Nebraska Department of Health and Human Services to take custody of the children.

The State's petition was amended on July 28, 2010, to add allegations against the biological father, and no new allegations were added against Teresa.

A hearing was held on the amended petition on August 4, 2010. The court's order on August 4 found Gary and Leanna to be children within the meaning of § 43-247(3)(a) by a preponderance of the evidence insofar as Teresa was concerned. The court ordered Teresa to (1) undergo a pretreatment assessment as arranged by the Department of Health and Human Services, (2) obtain and maintain a legal source of income, (3) obtain and maintain safe and adequate housing for herself and the children, (4) undergo chemical dependency and psychological evaluations with a parenting assessment, (5) cooperate with "Family Support Worker services," (6) submit to random drug and alcohol testing, and (7) be allowed reasonable rights of supervised parenting time.

The court held several disposition and evaluation hearings regarding Teresa and found that it continued to be in the best interests of the minor children to remain in out-of-home placement. On December 16, 2011, the State filed a motion for termination of parental rights as to Teresa. The hearing on the State's motion took place on June 14 and 26, September 18 and 20, and October 23, 2012.

Angie Williams, a family permanency specialist, testified that she was involved in this case beginning in June 2011. She testified that the children were removed in July 2010 from Teresa's home and that they did not return to the home of either parent at any time prior to the hearings on the State's motion for termination of parental rights.

When Williams became involved in the case, Teresa was provided supervised visitation and was ordered to participate in family therapy and individual therapy. By September 2011, Teresa had supervised visitation with the children two times per week and was provided with transportation or bus tickets to help her attend visits.

Williams testified that dual diagnosis therapy was set up for Teresa but that it did not occur because the provider had a change of staff and there was a miscommunication with Teresa. However, Williams noted that Teresa did not communicate with the provider to find out why the services were not occurring.

Renae Hinrichs was involved in this case initially as a service coordinator, and then as a family permanency specialist for a behavioral health care company. Hinrichs testified that Teresa failed to provide any verification of employment or income and that by December 2010, it was unclear whether Teresa was participating in therapy because documentation was not received by

any providers indicating participation. Hinrichs requested Teresa execute a release of information so Hinrichs could speak to the therapeutic providers but Teresa did not comply with this request. Teresa did not participate in family therapy and failed to complete a parenting class, even after referrals were made to the behavioral health care company and two separate family services programs.

Throughout this case, Teresa was ordered to comply with random urinalysis testing. Mary Spittler, who oversaw and implemented the in-house drug testing program with the behavioral health care company testified that the company sent a letter to Teresa explaining the policies and procedures of the testing program. Spittler explained that the times available to test were Monday through Friday, from 9 a.m. to 8 p.m., and on Saturday, from either 9 to 11 a.m. or 3 to 5 p.m. Spittler testified Teresa was supposed to come in three times per week beginning on November 15, 2010. Teresa was removed from the schedule, because she failed to consistently show up for testing between November 15, 2010, and January 7, 2011.

Patricia Studts, a toxicologist, testified to the results of three urinalysis tests from Teresa. She testified that the only way to test positive for methamphetamines was through ingesting or smoking methamphetamines and that methamphetamines could not be absorbed into the skin from particles in the air. Studts testified that on November 6 and 17, 2011, Teresa tested positive for methamphetamines. She also testified that on February 19 and 20, 2012, Teresa tested positive for both methamphetamines and illegal amphetamines. She testified there are certain medications that might lead to false positives, but only on the initial screening. She said that any false positives are ruled out from gas chromatography mass spectrometry, which was performed on all such tests, and that the results were reported to Spittler.

Hinrichs testified that by December 2010, the field urinalysis tests for Teresa were consistently positive for methamphetamines. Hinrichs testified that in March 2011, Teresa continued to test positive for amphetamines and methamphetamines.

Williams testified regarding Teresa's participation in urinalysis testing. She stated concerns that Teresa was not participating consistently and was not testing two times per week, as requested. She also noted that the preliminary results and the laboratory results came back positive for methamphetamines. She testified that Teresa was participating in chemical dependency treatment, but that she did not successfully complete the program. A letter from the program to Teresa indicates her case was administratively discharged due to inactivity. The program records indicated she did not show up for an appointment one week and canceled her recurrent appointment the next week.

An outpatient therapist and director of a community service program testified that that program was referred to conduct urinalysis testing for Teresa in April 2012. The outpatient therapist and director testified to the number of attempts made to collect specimens from Teresa in the months following the referral and to the number which were successful. Teresa completed the following tests in 2012: 2 of 4 in April, 3 of 11 in May, 2 of 5 in June, 0 of 6 in July, 1 of 5 in August, and 0 of 4 in September.

Teresa was ordered to maintain safe and stable housing. Teresa lived with a man named "Ed Pope," and this was a concern for the service providers involved in this case. Amanda Gurock, the children's therapist, testified that she was given notice that Pope had been convicted of two separate incidents of sexual abuse and child abuse.

Hinrichs testified that Pope resided with Teresa for some time prior to the court's involvement in this case and that he acted in a parental capacity. She testified that she discussed Pope's criminal history with Teresa, as well as the likelihood that it would be difficult for Teresa to reunify with the children while she still lived with Pope. Specifically, Hinrichs was concerned with Pope's criminal convictions. Hinrichs testified that she was not able to make recommendations in a court report for Pope because he was not a party to the case, but that she made verbal recommendations that if he were provided services, they might be able to determine if his presence in the home would be beneficial for the children.

At the time the children were removed from the home, Teresa resided with Pope in a mobile home. Williams testified that Pope's presence in the home was a concern for support workers. Teresa testified that she and Pope lived in the mobile home until February or March 2012.

Williams testified that Teresa told her she planned to move from the mobile home because she could not afford the payments and she was told it was too small for the children to return to. Teresa also told Williams she planned to move into a friend's home. Williams testified that she knew a background check previously had been performed on the friend because she expressed an interest in providing permanency for Teresa's children. However, the friend did not pass the background check. Williams told Teresa that reunification could not occur if she lived in a home with that friend, but that Teresa moved in with her in spite of this information.

Williams testified that Teresa lived with the friend for a few months and moved out of that home and into another friend's home a few months before the termination hearing. At the termination hearing, Teresa testified that she moved into a home on 30th and Titus on July 15, 2012, and that is where she currently resided. Teresa said that the home belonged to a man named "Ron Teater" and that she lived with him, her mother, Pope, and another friend. Teresa testified that she shared a room with Pope in the six-bedroom home and that the other adults each had their own bedroom. Williams testified at the termination hearing that Teresa did not have safe and stable housing.

Williams stated that she could not confirm or dispel her suspicions about Pope's possible drug use, because Pope had not completed a chemical dependency evaluation or submitted to urinalysis testing. She testified that his presence in the home was also a barrier to reunification.

In March 2012, Williams recommended fully supervised visits between Teresa and the minor children. She testified that visits were reduced to once per week due to Teresa's consistently missing visits, the changes in the children's behaviors before and after visits, and the therapeutic recommendation for reducing visits until Teresa became consistent and the children's behaviors improved. She testified the children's behaviors surrounding visits included the children's not following directions, having severe tantrums, experiencing increased anxiety, and wetting themselves before, during, and after visitations. Williams also noted that Teresa was inconsistent with visits, she failed to bring appropriate foods, and she failed to provide an appropriate location for visits despite assistance and guidance from workers, including Williams.

Joe Woods was the visitation specialist for Gary and Leanna from April to September 2012. He testified that in April 2012, Teresa was on a call-to-confirm condition for visitation because of attendance concerns and failure to have a site for visitation to occur. This condition requires telephone confirmation within a predetermined time period from the parent for visitation

to occur. Woods testified that Teresa did not call to verify visits on multiple occasions. For example, in the month of May, four visits were scheduled and only two visits took place. Two of the visits were canceled because Teresa did not call to confirm, and at least one of the visits was cut short because of heat. Woods testified that it was very hot and that Gary became lethargic and complained of stomach problems and headaches because of the heat. Woods said that within a short period after the visit, the foster mother called to inform him that Gary had vomited.

In June 2012, Teresa failed to attend three out of five visits because she did not call to confirm and there was severe weather so the visits could not take place outside. Woods testified that he brainstormed indoor visitation options, including the library, fast-food restaurants, and a children's museum, but Teresa did not choose any indoor locations. Teresa did not wish to visit a restaurant because she did not have money to buy food for the children and because transportation was an issue. Woods testified that bus passes were provided. The library was not an option because of the late hour that visitation was to take place. Woods testified that Teresa displayed minimal progress and failed to supply appropriate nourishment for the children. He also stated that Teresa became defiant and argumentative when inconsistencies regarding supplying basic necessities for Gary and Leanna were addressed.

Woods also testified that even though Gary had prior issues with the heat, during one of the visits in July 2012, Teresa attempted to convince Gary to stay after he began complaining about the heat. Teresa suggested sprinkling water on the children to keep them cool. She also appeared to be manipulating the children into staying by talking about how she did not get to see them often. During another visit in July, Teresa had an inappropriate conversation with the minor children and, later in the visit, the children requested to end the visit early.

Woods said that when visits did occur, Teresa's interactions with the children were typically very good. He said that she would play and interact with them and that most of the time, the children appeared to enjoy her company.

Gurock, the children's therapist, also testified regarding visitation between Teresa and the children. She testified that when Teresa misses a visit, Gary does not display much emotion. In contrast, other children in this situation typically acknowledge missing their parent or are sad to not have a visit. She testified that during visits, Gary became sick with headaches and stomachaches, and that the visits were cut short. Gurock's report on March 13, 2013, stated Gary and Leanna both expressed to Gurock that they did not want to attend visitation with Teresa and that they did not want to see her anymore. She testified that the behavior of both children changes after visitation with Teresa and that their anxiety increases. Specifically, Gary becomes defiant to foster parents, shuts down, or becomes "heightened and quick to . . . fly off the handle." Gurock's report recommended reducing the number of visits to one per week for 2 hours.

The children's foster mother testified that prior to visits with Teresa, Gary became anxious and scared or nervous. He would become clingy, state that he did not want to go on the visit, and would frequently cry. She testified that after visits, Gary becomes very aggressive toward Leanna, becomes very clingy, and will need at least 40 minutes to calm down. She testified that Leanna becomes confused prior to visits and following visits and that she gets very aggressive with Gary, name-calls, talks back, slams doors, and has abnormally forceful temper tantrums.

The foster mother testified that Teresa asked her not to give the children anything to eat or drink before their visit because Teresa planned to feed them. However, she stated that she frequently has to feed Gary and Leanna following their return from visits because they did not get any food, or enough food, from Teresa. She also testified that at times, Leanna would return from visits with an injury. She also said that at times, the children returned from visits at a park and vomited because it was too hot outside.

Hinrichs testified that Teresa wanted to be informed of the children's medical conditions and that she was upset and concerned when this information was not provided to her. However, the children's foster mother testified that she tried to maintain contact with Teresa regarding school activities and visits to the doctor but that she was often unable to reach Teresa by telephone.

The court ruled on the termination of Teresa's parental rights in an order filed October 29, 2012. The court found by clear and convincing evidence that Teresa failed to complete a chemical dependency program, failed to participate in individual therapy, failed to complete an outpatient dual-diagnosis treatment program, and continued to use alcohol and/or controlled substances, all of which led to the determination that Gary and Leanna came within the meaning of § 43-247(3)(a). The court found the minor children to be within the meaning of Neb. Rev. Stat. § 43-292(2), (6), and (7) (Cum. Supp. 2012) by clear and convincing evidence and found that termination of Teresa's parental rights was in the best interests of the minor children.

Teresa timely appeals the order of the separate juvenile court of Douglas County.

ASSIGNMENTS OF ERROR

Teresa asserts the court erred in finding statutory grounds for termination under § 43-292(2) and (6) and finding that it was in the best interests of the minor children to terminate her parental rights. Teresa also asserts she was deprived of her right to a fundamentally fair procedure as guaranteed by the Due Process Clauses of the Nebraska and U.S. Constitutions.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independent of the juvenile court's findings. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). However, where evidence is in conflict, the appellate court will consider and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. *Id.*

ANALYSIS

*Statutory Grounds for Termination.*
In order to terminate an individual's parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012).

The trial court in this case found clear and convincing evidence that three of the statutory grounds listed in § 43-292 were present. First, the court found Teresa had substantially and continuously or repeatedly neglected and refused to give the minor children necessary parental

care and protection under § 43-292(2). Second, the court found that under § 43-292(6), reasonable efforts had been made to preserve and reunify the family, and that such efforts have failed to correct the conditions leading to the determination. Third, the court found that the minor children had been in an out-of-home placement for 15 or more months of the most recent 22 months under § 43-292(7).

Teresa did not assert the juvenile court erred in finding the children had been in out-of-home placement for at least 15 of the most recent 22 months. The evidence shows the children were removed from Teresa's home on July 23, 2010, and were not returned to the home prior to the termination of Teresa's parental rights on October 29, 2012. It is clear the children have been in out-of-home placement for at least 15 of the most recent 22 months, satisfying the grounds for termination under § 43-292(7).

Teresa alleges the court erred in finding the statutory grounds were met under § 43-292(2) and (6). However, the State must prove the existence of only one statutory ground, and because Teresa failed to assign § 43-292(7) as error, we affirm the determination of the district court finding the existence of that ground for termination.

*Best Interests of Child.*

Having determined Teresa failed to assign the termination of her parental rights under § 43-292(7) as error, the determination of the juvenile court stands and we next address the best interests of the minor children.

Teresa asserts that the juvenile court erred in finding that termination of her parental rights was in the children's best interests.

The juvenile court found by clear and convincing evidence that Teresa failed to complete a chemical dependency program, failed to participate in individual therapy, failed to complete an outpatient dual-diagnosis treatment program, and continued to use alcohol and/or controlled substances. In addition, the court found that the children had been state wards for almost 2 years.

A review of this record shows that Teresa was provided with numerous services but failed to fully utilize the services provided. She failed to participate in therapy or the required treatment programs. She did not regularly submit to urinalysis testing, although it was regularly available, at no cost to her. When she did participate, she tested positive for methamphetamines and amphetamines.

Teresa asserts she failed to complete dual-diagnosis treatment because there is a chance her positive drug tests could have been false positives. However, Studts testified the only way to test positive for methamphetamines was through ingesting or smoking the drug. She testified there are certain medications that might lead to false positives, but only on the initial screening. She said any false positives are ruled out from gas chromatography mass spectrometry tests, which were used to confirm Teresa's positive tests.

Teresa was also ordered to provide and maintain safe and stable housing for the children as well as a legal source of income. Support workers testified that Teresa failed to make progress with the court orders, and they noted there were certain barriers preventing the children from returning to Teresa's home. Such barriers included Teresa's positive tests for methamphetamines and her inability to provide a safe home for Gary and Leanna to return to. Teresa was warned

that residing with Pope or one of her friends would make reunification difficult because Pope had a criminal history and the friends did not pass the appropriate background check.

Teresa was given the opportunity to engage in visitation, but she did not take full advantage of the opportunity. She missed several visits and was asked to call to confirm her visits. When she did not do so, the visits were canceled. She was given suggestions for indoor locations, but she opted to visit with her children outdoors, despite their history of illness and discomfort caused by the heat. She also failed to provide adequate food and drink for the children during such visits. Although workers reported that she interacted well with the children, they also stated that at times, she attempted to manipulate them and engaged in inappropriate conversations. The evidence shows she did not consider the best interests of the children in asking them to remain with her during a visit after they complained of heat or physical ailments. Over time, Teresa's inconsistent attendance caused a reduction in weekly visits.

While the record shows that Teresa loves her children, the record also reflects that the children are confused and their behavior and mental state are negatively affected by their current position. They have been in foster care for over 2 years, and Teresa has not made any measurable progress.

When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the child's best interests require termination of parental rights. *In re Interest of Emerald C. et al.*, 19 Neb. App. 608, 810 N.W.2d 750 (2012). Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *Id.* For the reasons discussed above, we find, upon our de novo review, that termination of Teresa's parental rights was in the children's best interests.

*Due Process.*

This court recognizes that the parent-child relationship is afforded due process protection. *In re Interest of Marcos S.A. & Andres S.*, 19 Neb. App. 426, 807 N.W.2d 794 (2011). The central meaning of due process has been that parties whose rights are to be affected are entitled to be heard. *Id.* When a person has a right to be heard, procedural due process includes notice to the person whose right is affected by the proceeding; reasonable opportunity to refute or defend against the charge or accusation; reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by the Constitution or statutes; and a hearing before an impartial decisionmaker. *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004).

In this case, Teresa alleges she was deprived of her constitutional right to procedural due process as guaranteed by the Nebraska and U.S. Constitutions, because she was not provided proper notice that her relationship with Pope would be at issue in her termination proceeding.

The State's motion for termination of parental rights alleged in count V(A) that Teresa failed to obtain and maintain safe and adequate housing for herself and her children. This allegation could encompass a variety of factors, including, but not limited to, the state of the home and the fact that Teresa resided with Pope, who was convicted of criminal activity.

The evidence shows she was given notice through the State's motion for termination of her parental rights that the safety and condition of her home was at issue at the hearing. Support workers testified that they had discussed Pope's criminal history with Teresa throughout the

case. Hinrichs testified that in March 2011, she told Teresa that residing with Pope would be a barrier to reunification because of his criminal convictions. Williams also testified that she had multiple conversations with Teresa about separating herself from Pope. Williams said Teresa always stated that she would not leave Pope and that he was a good support for her. Teresa was given the opportunity to cross-examine the witnesses, and she took advantage of such opportunity through her counsel. In addition, she was permitted to testify and Pope also testified.

Teresa's brief suggests she is dissatisfied because the court did not offer services or conduct assessments to ascertain what risk Pope presented to the children. However, the fundamental liberty interest in procedural due process is afforded to biological parents. See *In re Interest of L.V.*, 240 Neb. 404, 482 N.W.2d 250 (1992). Pope has no biological relationship with these children and is not a party to this case.

Finally, the record shows the juvenile court did not rely on this allegation as part of the determination that Teresa's parental rights should be terminated. Rather, the court found that count V(A) regarding Teresa's ability to provide safe and stable housing was dismissed for lack of proof by clear and convincing evidence, and we find it had no bearing on the court's ultimate decision to terminate her parental rights.

We find Teresa was not deprived of her constitutional rights.

CONCLUSION

We find Teresa failed to assign § 43-292(7) as error, and we affirm the juvenile court's determination that there were statutory grounds for termination on that basis. Upon our de novo review, we find clear and convincing evidence that termination of Teresa's parental rights is in the best interests of the minor children. We also find Teresa was not deprived of her procedural due process rights, and we affirm the juvenile court's termination of Teresa's parental rights.

AFFIRMED.