297 S.E.2d 200

**WEST VIRGINIA DEPARTMENT OF WELFARE, ex rel. Noel EYSTER, Social Service Worker**

v.

**Gary KEESEE, et al.**

**No. 15440.**

Supreme Court of Appeals of West Virginia.

May 27, 1982.

Billie Gray, Asst. Atty. Gen., for appellees.

Helen M. Morris, David J. Lockwood, Huntington, for appellants.

NEELY, Justice:

This is an appeal from two separate orders of the Circuit Court of Cabell County entered on 25 June 1981. One order permanently terminated the parental rights of Gary Keesee and the other order permanently terminated the parental rights of Mary Workman to their twin sons, Gregory and Gary Keesee. In order to understand the issue in this case a somewhat extended recitation of the facts is necessary.

The appellants had lived together out of wedlock for nearly three and a half years; their relationship was characterized by violent acts against one another, escalating during the winter of 1980–81 until events reached dangerous proportions. On the evening of 4 March 1981 the State Police called Noel Eyster, Child Protection Services worker for the Cabell County Department of Welfare, to come to Mary Workman's apartment. Arriving at 10 p.m., Mr. Eyster saw a pool of blood on the living room floor, unhinged and smashed closet doors, piles of clothes strewn about, and dents and holes in the refrigerator and gramophone. He found Mary Workman upstairs lying in bed on a blood-soaked pillow with a large gash in the back of her head. She claimed that her boyfriend, Gary Keesee, had hit her with the butt of a

2

shotgun after she had fired it in order to scare him. She refused to go to the hospital for treatment because she thought Keesee would get hold of their seventeen-month-old twin sons in her absence. Only after Mr. Eyster promised to secure overnight shelter for the infants did she agree to go to the hospital.

After bringing the two boys to an emergency shelter, Mr. Eyster went to the hospital and took Ms. Workman home. Later that night there was another altercation between the appellants. Keesee sustained pellet wounds, and Workman suffered a broken nose and an injury to her mouth. With both parents in jail on the morning of 5 March, Mr. Eyster made arrangements to provide for continuing shelter for the children. Later that day a petition alleging abuse and neglect of Gary and Gregory Keesee was filed in the Circuit Court of Cabell County. A hearing was scheduled for 10 March 1981.

However, before the hearing was held, another incident occurred. At approximately 3:30 a.m. on 6 March 1981 Keesee was hospitalized after Workman stabbed him in the chest with a knife. Workman explained her acts by stating that she was distraught at the loss of her children. There was alternative testimony that Keesee was forcing her to engage in sexual acts with a hitchhiker the couple had picked up the day before.

After the hearing which took place on 10 and 12 March, the court ordered custody to remain with the Department of Welfare for thirty days and enjoined Mr. Keesee from visiting Ms. Workman's apartment for the same length of time. The order also directed that the appellants cooperate with the West Virginia Department of Welfare in an attempt to improve their behavior through counseling and psychological testing. At no point in this hearing or in any of the hearings that followed was it ever alleged that the parents had physically harmed their sons in any way.

Within a few days of the events just described it came to the attention of the court that Keesee and Workman were meeting at places other than her apartment, and would then drink, fight, and end up in jail. The court therefore amended the order to enjoin both parties from molesting or interfering with the other. The court also cited both parents for criminal contempt but postponed sentencing until 10 April.

At the 10 April hearing the court heard testimony concerning the progress that the parents had made with respect to their alcohol abuse and penchant for violence. Determining that some visitation rights would actually help Ms. Workman in dealing with her personal problems, the court ordered that, while the children would remain in the custody of the Department of Welfare, Ms. Workman could visit them at times permitted by the Department of Welfare. The court also found that the parties had purged themselves of contempt by staying away from one another.

Following a hearing on 18 May 1981 the court gave Mary Workman the physical care, custody and control of the infant children for a thirty day improvement period. The injunction against the parents seeing each other was continued. However, Keesee visited Workman on 9 June and the two got into a fight again. This time the fight involved his tearing a door off to gain access, beating her with a toy broom, and hitting her over the head with a coke bottle. She got in her licks by tearing buttons off his shirt, hitting him with a chair, and knocking him down a flight of stairs.

The 9 June incident prompted a hearing that was held on 15 June 1981. The court extended the period of temporary custody of the children with Ms. Workman until 11 September. The court also found Keesee in contempt. Rather than sentencing Keesee on the spot, the court scheduled a jury trial for the following day to determine guilt.

Mary Workman was subpoenaed to testify against Keesee at this trial for criminal contempt. When she failed to appear at the trial on 16 June, the court immediately rescinded his order of 15 June that had extended the temporary custody and ordered that the custody of the children be given to the Department of Welfare.

On 17 June 1981 a hearing was held to seek the permanent termination of Ms. Workman's parental rights. At the hearing the State summarized all of the facts that had come out at the various hearings during the previous three months. The State characterized Ms. Workman's failure to comply with the subpoena as being indicative of her inability to put the needs of her children ahead of her affection for their father. When cross-examined Mr. Eyster admitted that Ms. Workman's care for the children over the course of the month since she had regained their custody was satisfactory. Nevertheless, the court permanently terminated Ms. Workman's parental rights.

At a similar proceeding on 23 June 1981, the court heard testimony concerning Mr. Keesee's parental rights. Having failed to find someone other than Ms. Workman to help him raise the children and knowing that the court would not grant him custody without his having someone to so help him, Mr. Keesee elected not to attend the hearing. The court then ordered that his parental rights be terminated permanently.

The appellants appeal the orders of the trial court essentially on the basis of one asserted error. The appellants contend the trial court erred in permanently terminating their parental rights without notice and an opportunity to be heard. While it is clear from the record that the appellants' behavior warranted scrutiny by the State Department of Welfare, we feel, nevertheless, that the appellants were deprived of their statutory rights to notice and a hearing before their rights were terminated permanently.

█ This Court has consistently held that before the State may terminate the parental rights of an individual, the State must provide notice and the opportunity for a meaningful hearing. *E.g., In re Willis,* 157 W.Va. 225, 207 S.E.2d 129 (1973); *In re Sutton,* 132 W.Va. 875, 53 S.E.2d 839 (1949). The requisites for proper notice are set out in *W.Va.Code,* 49–6–1(b) [1977]. That statute mandates that at least ten days notice be given to the parents before the hearing. It also provides that "[f]ailure to object to the defects in the petition and notice shall not be construed as a waiver."

Requisites for a meaningful hearing are set out in *W.Va.Code,* 49–6–2 [1980]. Under that statute the parents have the right to counsel, the right to present and cross-examine witnesses, and the right to testify in their own behalf. The statute also provides that the State must prove its case by clear and convincing evidence.

*W.Va.Code,* 49–6–5 [1977] provides a panoply of dispositional alternatives to the court. These alternatives range from dismissing the petition through structuring a program of State counseling and supervision to permanent termination of parental rights. However, after a disposition other than permanent termination resulting in adoption of the children has been made, the court may modify its disposition under *W.Va.Code,* 49–6–6 [1977] upon a showing of changed circumstances. This statute also provides that "[a]dequate and timely notice of any motion for modification shall be given to the child's counsel, counsel for the child's parent or custodian and to the State Department."

█ In the present case we find that there was sufficient compliance with the statutory scheme until 17 June when the State moved to terminate Ms. Workman's parental rights permanently. The court's decision to terminate her rights following as it did less than forty-eight hours after his order extending her custody of the children to 11 September was precipitous and could be viewed as capricious. We fully recognize that the trial court had devoted a large amount of time and had demonstrated his sincere desire to work out a program that would protect both the interests of the children and the rights of their parents. However, we find that permanently terminating Ms. Workman's parental rights at the 17 June hearing to which she had inadequate notice was error.

The record contains no trace of "adequate and timely notice" before the 17 June hearing that was in effect a hearing on the State's motion for modification. Ms. Workman obtained an attorney at 6 a.m. on the

morning of the hearing. The attorney accepted her case on a *pro bono* basis and attempted to represent her interest at the hearing having spent only an hour talking with her about the case. The court was correct in trying to deal with the contempt of the parents with alacrity. However, in the heat of trying to handle contempt proceedings against both parents, the court was ill-advised to make a concurrent determination concerning parental rights. The better course would have been to provide the adequate and timely notice of a motion for modification provided for in *W. Va. Code,* 49-6-6 [1977].

A better case might be made in support of the court's determination to terminate the parental rights of Mr. Keesee because he was given a week's notice before the hearing on 23 June. However, since the adjudication of his parental rights hinged on his ability to find someone to help him raise the children and since the termination of Ms. Workman's rights foreclosed his best and natural candidate in this regard, the procedural irregularities surrounding Ms. Workman's hearing had a direct impact on his hearing as well. Hence, he too was in effect denied the procedural protections of *W. Va. Code,* 49-6-6 [1977].

■ Our review of the record informs us that the hearings that preceded the 17 June hearing were all conducted with the understanding that the worst that could happen to the parents was that they would lose temporary custody. All the testimony at those hearings was directed towards fashioning a program of improvement for the parents. The only time at which the State spoke of permanent termination was at the 17 June hearing and the subsequent hearings for Mr. Keesee. It is our conclusion that before the Court orders permanent termination of parental rights, the parents must be afforded adequate and timely notice of the State's intention to seek such

permanent termination so they may prepare properly for a meaningful hearing.

We recognize that in this case the Department of Welfare has worked energetically on behalf of the infant children and that the patience of the circuit judge was tried to the breaking point by very difficult individuals with whom it was almost impossible to deal rationally. Furthermore, when people pay no more attention to court orders than they would to solicitations from the March of Dimes it can be reasonably expected that at some point the patience of the trial court would be exasperated—all the more so because the well-being of two defenseless infant children was at stake.

The postscript to this case came to this Court's attention during oral argument where we learned that in contempt of the circuit court Ms. Workman and Mr. Keesee abducted the children and took them to Florida where they have been living together for some months now. Furthermore, Ms. Workman and Mr. Keesee are now married to one another—at least according to the representations of their counsel. Thus, upon remand the trial court should let bygones be bygones—forget about contempt and prior violence—and focus on the safety of the children and the conduct of the parties after their flight and marriage.[1] Certainly absconding the jurisdiction to begin life anew in Florida in order to keep their children and their regularization of their tumultuous relationship both indicate that they value the children and want to be parents. Children need parents, and so we would hope that the Department of Welfare and the circuit court try to help these people if possible should it appear, and only if it should appear, that the safety of the children is no longer in jeopardy.

Accordingly for the reasons stated above the orders of the Circuit Court of Cabell County are reversed and this case is remanded for further proceedings of a non-

1. The Court recognizes that as a general rule forgiving contempt of court undermines respect for law and destroys the authority of society's preeminent force for order. Yet what is at stake in this case are living, breathing, feeling children who know nothing about rules of law and need parents if that can be arranged. This case is like the Tar Baby from the *Tales of Uncle Remus;* the more you punch it the more stuck you get. The interest of the children in this case outweighs any other interest going to the integrity of courts, so we shall just unstick ourselves!

punitive nature consistent with this opinion.

Reversed and remanded.