529 S.E.2d 865

**STATE of West Virginia ex rel. JEANETTE H., Petitioner,**

v.

**Honorable David M. PANCAKE, Judge of the Circuit Court of Cabell County, and the West Virginia Department of Health and Human Resources, Respondents.**

No. 27061.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 22, 2000.

Decided April 24, 2000.

**158**

R. Matthew Vital, Vital & Vital, L.C., Huntington, West Virginia, Attorney for the Petitioner.

Darrell V. McGraw, Jr., Attorney General, William P. Jones, Assistant Attorney General, Bureau for Children & Families, Charleston, West Virginia, Attorney for Respondent, West Virginia Department of Health and Human Resources.

Lisa F. White, Huntington, West Virginia, Guardian ad Litem for the minor children.

DAVIS, Justice:

In this original proceeding in prohibition, petitioner, Jeanette H.,[1] a parent who was incarcerated by the State of West Virginia, sought to prohibit the Honorable David M. Pancake, Judge of the Circuit Court of Cabell County, from refusing to order her transportation to a dispositional hearing where her parental rights to her five minor children might be terminated. During the pendency of the proceedings in this Court, however, Jeanette H. was granted parole. Consequently, the issue raised is technically moot and the writ, therefore, is dismissed. Nevertheless, because the important ques-

---

1. "We follow our past practice in domestic and juvenile cases involving sensitive facts and do not use the last names of the parties. *See, e.g., State ex rel. Amy M. v. Kaufman,* 196 W.Va. 251, [254 n. 1,] 470 S.E.2d 205[, 208 n. 1] (1996)." *Elmer Jimmy S. v. Kenneth B.,* 199 W.Va. 263, 264 n. 1, 483 S.E.2d 846, 847 n. 1 (1997).

tion raised in the instant petition satisfies the exception to the mootness doctrine, we address the issue on its merits. In this regard, we conclude that the decision of whether to transport an incarcerated parent to a dispositional hearing is within the circuit court's discretion, and we set forth the factors to be considered by that court in exercising its discretion.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The following facts are set forth in the Petitioner's brief, and are not disputed by the respondents. Throughout the proceedings that lead to the filing of the instant petition, Jeanette H., the petitioner, was in the custody of the West Virginia Department of Corrections. Following Jeanette H.'s arrest, for violating conditions imposed upon an earlier parole, the West Virginia Department of Health and Human Resources [hereinafter "DHHR"] filed a petition to gain immediate custody of Jeanette H.'s five minor children. In response to this petition, Judge Pancake found probable cause of abuse and neglect and granted custody of the children to the DHHR. On August 31, 1999, Jeanette H. filed a motion requesting a post-adjudicatory improvement period. Judge Pancake granted the motion on September 8, 1999. The improvement period was to commence upon Jeanette H.'s arrival at a drug rehabilitation treatment center.[2] Thereafter, on October 18, 1999,[3] the DHHR initiated proceedings to terminate Jeanette H.'s parental rights.[4] A termination hearing was then docketed for January 12, 2000.

After receiving notice of the termination proceedings, Jeanette H. presented Judge Pancake with a proposed order directing her transportation from the McDowell County Jail so that she might attend the proceedings. Judge Pancake declined to enter the order and responded by letter to Jeanette

H.'s counsel stating "I know of no constitutional directive for your client to be present, and it is not our custom to transport persons under these circumstances." Jeanette H. then filed a motion for a writ of prohibition in this Court seeking to prohibit the circuit court from refusing to enter her proposed order. We granted a rule to show cause returnable on February 22, 2000. Subsequent thereto, on April 10, 2000, Jeanette H. filed a motion to dismiss stating that she had been released on parol and, as a consequence of her release, the issue raised in her petition for writ of prohibition had been rendered moot.

## II.

### MOOTNESS

Due to Jeanette H.'s release from custody, her incarceration is no longer an impediment to her attendance at the hearing to take up the issue of her parental rights. For this reason, the issue herein raised is technically moot. Generally, moot questions are not proper for consideration by this Court. " 'Moot questions or abstract propositions, the decision of which would avail nothing in the determination of controverted rights of persons or of property are not properly cognizable by a court.' Syllabus Point 1, State ex rel. Lilly v. Carter, 63 W.Va. 684, 60 S.E. 873 (1908)." Syl. pt. 1, State ex rel. Durkin v. Neely, 166 W.Va. 553, 276 S.E.2d 311 (1981). As with most general rules, however, there is an exception to this rule:

> "A case is not rendered moot even though a party to the litigation has had a change in status such that he no longer has a legally cognizable interest in the litigation or the issues have lost their adversarial vitality, if such issues are capable of repetition and yet will evade review." Syllabus point 1, State ex rel. M.C.H. v. Kinder, 173 W.Va. 387, 317 S.E.2d 150 (1984).

---

2. At the time her petition for writ of prohibition was filed, Jeanette H. was engaged in a six-month residential drug-treatment program.

3. Jeanette H.'s brief does not indicate the duration of her improvement period.

4. The DHHR also sought termination of the parental rights of the minor children's fathers.

Syl. pt. 2, *State ex rel. Davis v. Vieweg*, 207 W.Va. 83, 529 S.E.2d 103 (2000). Elaborating on this exception, we have explained:

> Three factors to be considered in deciding whether to address technically moot issues are as follows: first, the court will determine whether sufficient collateral consequences will result from determination of the questions presented so as to justify relief; second, while technically moot in the immediate context, questions of great public interest may nevertheless be addressed for the future guidance of the bar and of the public; and third, issues which may be repeatedly presented to the trial court, yet escape review at the appellate level because of their fleeting and determinate nature, may appropriately be decided.

Syl. pt. 1, *Israel by Israel v. West Virginia Secondary Sch. Activities Comm'n*, 182 W.Va. 454, 388 S.E.2d 480 (1989). Applying these criteria to the circumstances presently before us, we conclude that the issue raised is proper for our consideration. Therefore, after reviewing the appropriate standard for our consideration of Jeanette H.'s petition, we will address the issue on its merits.

### III.

### STANDARD FOR WRIT OF PROHIBITION

■ We have frequently expressed the limits to our exercise of our original jurisdiction in prohibition by explaining that "[a] writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court. It will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers. *W. Va.Code*, 53–1–1." Syl. pt. 2, *State ex rel. Peacher v. Sencindiver*, 160 W.Va. 314, 233 S.E.2d 425 (1977).

■ Jeanette H. fails to explicitly state why prohibition is appropriate in this instance. Having observed that her arguments in support of her petition raise no jurisdictional issues, however, we conclude that she claims the lower court exceeded its legitimate powers. We have previously defined the factors to be considered by this Court in determining whether prohibition should issue where it is asserted that a court has exceeded its legitimate powers:

> In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syl. pt. 4, *State ex rel. Hoover v. Berger*, 199 W.Va. 12, 483 S.E.2d 12 (1996). Finally, we have repeatedly declared that " '[m]andamus, prohibition and injunction against judges are drastic and extraordinary remedies.... As extraordinary remedies, they are reserved for really extraordinary causes.' " *State ex rel. Lawson v. Wilkes*, 202 W.Va. 34, 38, 501 S.E.2d 470, 474 (1998) (quoting *State ex rel. Suriano v. Gaughan*, 198 W.Va. 339, 345, 480 S.E.2d 548, 554 (1996)). *See also State ex rel. United States Fidelity & Guar. Co. v. Canady*, 194 W.Va. 431, 436, 460 S.E.2d 677, 682 (1995); *State ex rel. Doe v. Troisi*, 194 W.Va. 28, 31, 459 S.E.2d 139, 142 (1995). Because Jeanette H. has raised a new and important issue of law of first impression in this jurisdiction, we find it may properly be considered in the context of a writ of prohibition.

## IV.

### DISCUSSION

 Jeanette H. contends that the circuit court erred by declining to enter her proposed order authorizing her transportation to the Cabell County Courthouse to attend a dispositional hearing addressing the possible termination of her parental rights.[5] She argues that a parent is entitled to certain due process protections flowing from the fundamental interests associated with the parent/child relationship. The specific issue raised by Jeanette H., whether an incarcerated parent has a due process right to be present at a hearing on the termination of his or her parental rights, is a question of first impression for this Court.[6] Although the specific issue herein raised is novel in this jurisdiction, it is, nevertheless, well established that a parent has a constitutionally protected liberty interest in retaining custody of his or her child and is, therefore, entitled to certain due process protections when the State seeks to terminate the parent/child relationship:

5. We note that the circuit court's ruling on Jeanette H.'s request for transportation was rendered in a letter rather than a formal order. While the remedy of prohibition is typically invoked to prohibit the enforcement of an order, we find that under the particular circumstances of this unique case, the issue raised may nevertheless be addressed.

6. We are troubled by the fact that, although this is an issue of first impression, neither the West Virginia Department of Health and Human Resources nor the guardian *ad litem* for Jeanette H.'s five children saw fit to file a response on the merits. We recognize that the guardian *ad litem* for these children has a reputation for diligently and competently discharging her guardianship duties. However, due to her failure to respond in this instance, we feel compelled to reiterate our prior declarations of the duty owed to minors by their guardians *ad litem* when a child abuse and neglect case is brought to this Court. The importance of appellate representation by guardians *ad litem* was summarized in *State v. Michael M.*, 202 W.Va. 350, 355 n. 11, 504 S.E.2d 177, 182 n. 11 (1998), wherein we observed:

> In Syllabus Point 5 of *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991), we held that "[t]he guardian ad litem's role in abuse and neglect proceedings does not actually cease until such time as the child is placed in a permanent home." In *In re Christina L.*, 194 W.Va. 446, 454, n. 7, 460 S.E.2d 692, 700, n. 7 (1995), we admonished guardians *ad litem* that "it is their responsibility to represent their clients *in every stage* of the abuse and/or neglect proceedings. This duty includes appearing before this Court to represent the child during oral arguments." The guardian *ad litem* is also responsible for filing an appellate brief on behalf of his or her child ward.... We again underscore that guardians *ad litem* have a duty *to fully represent the interests of their child wards at all stages of the abuse and/or neglect proceedings*, both in the circuit court and on appeal.

(Emphasis added). In addition to filing briefs to represent their client's interests to this Court, the appearance of guardians *ad litem* during oral argument provides an important resource from which this Court may obtain valuable information. In *In re Katie S.*, 198 W.Va. 79, 91 n. 16, 479 S.E.2d 589, 601 n. 16 (1996), we commended a guardian *ad litem* for his appearance at oral argument and further described the guardian's duty of appellate representation:

> We note with approval that the guardian ad litem for the children appeared before this Court for oral argument and was able to answer several questions concerning the interests of the children. The record indicates that the guardian ad litem has been diligent in protecting his clients' interests below. We continue to emphasize that guardians ad litem have *a duty* to represent fully ... the child's appellate rights, if an appeal is necessary. In *Matter of Scottie D.*, 185 W.Va. 191, 198, 406 S.E.2d 214, 221 (1991), we stated:
>
> > It is well established that "[a]fter judgment adverse to his ward, the guardian ad litem has the right to appeal and the duty to do so if it reasonably appears to be to the advantage of the minor[.]" *Robinson v. Gatch*, 85 Ohio App. 484, 487, 87 N.E.2d 904, 906 (1949). This is based upon the principle that a guardian *ad litem* has a duty to represent the child(ren) to whom he or she has been appointed, as effectively as if the guardian *ad litem* were in a normal lawyer-client relationship.
>
> Part of the duty of appellate representation is the filing of appellate briefs, *even when not invited to do so....*

(Emphasis added). Although the instant proceeding is not before this Court on an appeal, and the ruling sought to be prohibited is not *necessarily* a judgment adverse to children herein involved, it nevertheless warrants participation by the guardian *ad litem*. The outcome of this action certainly affects the children's interests. Furthermore, our decision on this novel issue would have been aided by a response framed from the perspective of the children's interests. Therefore, we remind all guardians *ad litem* that their duty to represent their clients extends to *all stages* of abuse and neglect proceedings. *See Michael M.*, 202 W.Va. at 355 n. 11, 504 S.E.2d at 182 n. 11; *In re Christina L.*, 194 W.Va. 446, 454 n. 7, 460 S.E.2d 692, 700 n. 7 (1995).

"In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody [of] his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions." Syllabus Point 1, *In Re Willis,* 157 W.Va. 225, 207 S.E.2d 129 (1973).

Syl. pt. 1, *In Interest of Betty J.W.,* 179 W.Va. 605, 371 S.E.2d 326 (1988). The Supreme Court of the United States has similarly observed:

The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

*Santosky v. Kramer,* 455 U.S. 745, 753–54, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599, 606 (1982).

▮▮▮ Some general due process protections relating to a parent's participation in proceedings involving the welfare of his or her child(ren) have been established by the West Virginia Legislature, which has directed that "[i]n any proceeding pursuant to the provisions of this article, the party or parties having custodial or other parental rights or responsibilities to the child *shall be afforded a meaningful opportunity to be heard, in-*

cluding the opportunity to testify and to present and cross-examine witnesses." W. Va.Code § 49-6-2(c) (emphasis added). *See also* W. Va.Code § 49-6-5(a) (1998) (Repl. Vol.1999) ("The court shall forthwith proceed to disposition giving both the petitioner and respondents *an opportunity to be heard.*" (emphasis added)). In addition, this Court has previously held:

"West Virginia Code, Chapter 49, Article 6, Section 2, as amended, and the Due Process Clauses of the West Virginia and United States Constitutions prohibit a court or other arm of the State from terminating the parental rights of a natural parent having legal custody of his [or her] child, without notice and *the opportunity for a meaningful hearing.*" Syl. pt. 2, *In re Willis,* 157 W.Va. 225, 207 S.E.2d 129 (1973).

Syl. pt. 1, *West Virginia Dep't of Welfare ex rel. Eyster v. Keesee,* 171 W.Va. 1, 297 S.E.2d 200 (1982) (emphasis added).[7] While the foregoing authority clearly establishes that parents are entitled to a meaningful hearing, *i.e.,* the right to testify and to present and cross-examine witnesses, before their parental rights may be terminated, it does not resolve the specific question before us, as we have not heretofore addressed the question of whether an incarcerated parent's right to a meaningful hearing requires the parent's physical presence.[8]

▮▮▮ We believe that an incarcerated parent's right to a meaningful hearing is not accompanied by an automatic or absolute right to be physically present at termination proceedings. *See* Syl. pt. 4, *In re Interest of L.V.,* 240 Neb. 404, 482 N.W.2d 250 (1992) ("Parental physical presence is unnecessary for a hearing to terminate parental rights, provided that the parent has been afforded procedural due process for the hearing to terminate parental rights."); *In re Baby K.,* 143 N.H. 201, 204, 722 A.2d 470, 472 (1998) ("[D]ue process does not absolutely require

---

**7.** Though not an issue in the present case, we note that this Court has also recognized a parent's due process right to the assistance of counsel in proceedings which may result in the termination of parental rights. Syl. pt. 7, *In re Lindsey C.,* 196 W.Va. 395, 473 S.E.2d 110 (1995).

**8.** For a discussion of an incarcerated parent's right to be physically present at termination hearings, see Philip M. Genty, *Procedural Due Process Rights of Incarcerated Parents in Termination of Parental Rights Proceedings: A Fifty State Analysis,* 30 J. Fam. L. 757, 774 (1991–92).

an incarcerated parent's physical presence at a parental rights termination hearing, provided the parent is otherwise afforded procedural due process at the hearing." (citation omitted)). While there is no absolute right to be physically present at a hearing, there is the remaining question of what process is due. As we observed above, the right of a natural parent to the custody of his or her infant child implicates a fundamental liberty interest. We have previously explained that in determining the specific procedures necessary to protect a liberty interest, we should consider three general factors:

> The specific procedural protections accorded to a due process liberty or property interest generally require[ ] consideration of three distinct factors: first, the private interest that will be affected by state action; second, the risk of an erroneous deprivation of the protected interest through the procedures used, and the probable value, if any[,] of additional or substitute procedural safeguards; and third, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

Syl. pt. 5, *Major v. DeFrench,* 169 W.Va. 241, 286 S.E.2d 688 (1982). *Accord Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976). We have also recognized that there are certain fundamental principles to be applied when conducting a due process analysis, and due process requirements may need to be tailored to the specific circumstances of the case under consideration:

> Applicable standards for procedural due process, outside the criminal area, may depend upon the particular circumstances of a given case. However, there are certain fundamental principles in regard to procedural due process embodied in Article III, Section 10 of the *West Virginia*

*Constitution,* which are; First, the more valuable the right sought to be deprived, the more safeguards will be interposed. Second, due process must generally be given before the deprivation occurs unless a compelling public policy dictates otherwise. Third, a temporary deprivation of rights may not require as large a measure of procedural due process protection as a permanent deprivation.

Syl. pt. 2, *North v. West Virginia Bd. of Regents,* 160 W.Va. 248, 233 S.E.2d 411 (1977).

Applying *Major* and *North* to the circumstances with which we are presented in this case, we are instructed that the determination of the particular due process protections to which a parent is entitled in connection with a dispositional hearing on the termination of his or her parental rights necessitates the balancing of various important factors. First, in considering the private interests that will be affected by termination proceedings, utmost priority must be given to the best interests of the child(ren) involved. In addition, regard should be had for the parent's substantial interest in retaining legal custody of his or her child(ren). *See, e.g.,* Syl. pt. 3, *In re Katie S.,* 198 W.Va. 79, 479 S.E.2d 589 (1996) ("Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children.").[9] Next, the risk of erroneously terminating the parent's rights due to his or her absence from the dispositional hearing, and the effectiveness of alternate methods for obtaining the parent's participation, should be weighed. Third, the State's various interests, which include, but are not necessarily limited to, the State's significant *parens patriae* interest in protecting the welfare of the children involved,[10] the State's compelling interest in

**9.** *See also In re Jeffrey R.L.,* 190 W.Va. 24, 32, 435 S.E.2d 162, 170 (1993) ("Although the rights of the natural parents to the custody of their child and the interests of the State as *parens patriae* merit significant consideration by this Court, the best interests of the child are paramount.").

**10.** *See Jeffrey R.L.,* 190 W.Va. at 32–33, 435 S.E.2d at 170–71 (recognizing "that the State, in its role of *parens patriae,* 'is the ultimate protector of the rights of minors[,]' and 'has a substantial interest in providing for their health, safety, and welfare, and may properly step in and do so when necessary' " (citing *In Interest of Betty J.W.,*

protecting its citizens from the risk that a convicted criminal might escape (especially when the parent has been convicted of a violent crime), and the fiscal and administrative burdens to the State that are associated with allowing an incarcerated parent to attend a dispositional hearing, should be contemplated. Finally, in analyzing these factors, due regard should be given to the fundamental principles set forth in Syllabus point 2 of *North v. West Virginia Board of Regents*, 160 W.Va. 248, 233 S.E.2d 411.

While these considerations present a rather complex analytical framework, we note that other courts have wrestled with this issue and formulated a more manageable list of specific criteria as an aid in performing the appropriate analysis. One such court, the Supreme Court of Nebraska, has held:

> In deciding whether to allow a parent's attendance at a hearing to terminate parental rights, notwithstanding the parent's incarceration or other confinement, a court may consider the delay resulting from prospective parental attendance, the need for disposition of the proceeding within the immediate future, the elapsed time during which the proceeding has been pending before the juvenile court, the expense to the State if the State will be required to provide transportation for the parent, the inconvenience or detriment to parties or witnesses, the potential danger or security risk which may occur as a result of the parent's release from custody or confinement to attend the hearing, the reasonable availability of the parent's testimony through a means other than parental attendance at the hearing, and the best interests of the parent's child or children in reference to the parent's prospective physical attendance at the termination hearing.

Syl. pt. 6, *In re Interest of L.V.*, 240 Neb. 404, 482 N.W.2d 250. Applying these criteria, the court in Nebraska concluded that a lower court had not abused its discretion in disallowing an incarcerated father's physical presence at termination proceedings where the father was provided notice of the hearing and the specific accusations against him, was represented by counsel throughout the proceedings, was provided with transcripts of an initial hearing, participated in a second hearing by phone, was given the opportunity to recall any previously called witnesses for cross examination and had the opportunity to present his own evidence. The court cautioned, however, that "the procedure utilized by the county court surpassed the requirements of procedural due process applicable to [this] case; hence, the procedure used ... should not be construed as *the* standard to determine procedural due process for one who has a constitutional right to be heard in a proceeding." *In re Interest of L.V.*, 240 Neb. at 417, 482 N.W.2d at 259.

In reaching its holdings, the Nebraska Court relied on a decision by the Supreme Court of North Dakota, in which that court had similarly stated:

> From our review of cases from the various jurisdictions and the principles of law involved, we are compelled to conclude that a convict does not have a constitutional right to personally appear in a civil suit where he has been permitted to appear through counsel and by deposition, if appropriate. Any right to appear personally would have to rest upon convincing reasons and would ultimately be left to the sound discretion of the trial court.
>
> In making its determination the trial court may take into account the costs and inconvenience of transporting a prisoner from his place of incarceration to the courtroom, any potential danger or security risk which the presence of a particular inmate would pose to the court, the substantiality of the matter at issue, the need for an early determination of the matter, the possibility of delaying trial until the prisoner is released, the probability of success on the merits, the integrity of the correctional system, and the interests of the inmate in presenting his testimony in person rather than by deposition.

*In Interest of F.H.*, 283 N.W.2d 202, 209 (N.D.1979) (citations omitted). In this case, the court found that a father's due process rights had not been violated as the father was "represented by able counsel .... [and]

179 W.Va. 605, 608, 371 S.E.2d 326, 329

(1988)))).

was given the opportunity and did appear by deposition." *Id.*

■ While these two cases from Nebraska and North Dakota involved parents who were incarcerated outside of the state wherein their parental rights were being adjudicated, as opposed to the instant case where Jeanette H. was an in-state prisoner, the courts did not limit their discussions or holdings to out-of-state prisoners.[11] Because due process is a flexible concept, and factors such as those outlined by the Nebraska and North Dakota courts may be applied to determine the particular due process procedures that are required given the circumstances of each individual case, we conclude that the same due process analysis is applicable regardless of where a parent is confined.[12] As one court has aptly explained, "[d]ue process is not a static concept; rather its requirements vary to assure the basic fairness of each particular action according to its circumstances." *In Interest of J.L.D.*, 14 Kan.App.2d 487, 490, 794 P.2d 319, 321 (1990) (criticizing an earlier decision of the Court of Appeals of Kansas, *In re S.M.*, 12 Kan.App.2d 255, 738 P.2d 883

11. For other cases involving out-of-state incarcerated parents where the courts' analyses do not appear to have been limited to that particular factual condition, see *Pignolet v. State Dep't of Pensions & Sec.*, 489 So.2d 588, 591 (Ala.Civ. App.1986) (explaining that "[w]here there is representation by counsel and an opportunity to present testimony through deposition, then due process does not require that an incarcerated parent be allowed to attend the termination hearing"); *In re Heller*, 669 A.2d 25, 32 (Del.1995) (concurring with the proposition that " '[i]f a parent has been afforded procedural due process for a hearing to terminate parental rights, allowing a parent who is incarcerated or otherwise confined in custody of a government to attend the termination hearing is within the discretion of the trial court' " (quoting *In re Interest of L.V.*, 240 Neb. 404, 482 N.W.2d 250), and finding no due process violation where mother, who knowingly, intelligently and voluntarily chose to discharge appointed counsel and proceed pro se, participated in proceedings by telephone); *In re Randy Scott B.*, 511 A.2d 450 (Me.1986) (finding no due process violation where parent was represented at all stages of the proceedings, counsel had the right to cross examine all opposing witnesses, parent testified by deposition that was taken two weeks after all other evidence had been presented and counsel had the option of reopening the hearing for further cross-examination or additional testimony); *In re Vasquez*, 199 Mich.App. 44, 50, 501 N.W.2d 231, 235 (1993) (commenting that due process requires the three-part balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976), otherwise "there is never a requirement of producing incarcerated parents at trial even if they are in a nearby jail and the court finds that their physical presence is essential either to assist counsel or to resolve crucial factual disputes"); *In re Welfare of HGB*, 306 N.W.2d 821, 825–26 (Minn.1981) (observing that "the determination of what process is due involves a balancing of the interests involved in the specific case under consideration," and concluding there was no due process violation where parent was represented by counsel and could have participated through "[d]epositions or interrogations"); *In re Baby K.*, 143 N.H. 201, 204,

722 A.2d 470, 472 (1998) (reasoning that "due process does not absolutely require an incarcerated parent's physical presence at a parental rights termination hearing," but concluding that mother's rights were violated by informal procedures involving telephone connection); *In re Rich*, 604 P.2d 1248 (Okla.1979) (deciding that parent was not deprived of due process where he was appointed counsel and where his opportunity to participate in proceedings via deposition was not impaired); *State ex rel. Juvenile Dep't v. Stevens*, 100 Or.App. 481, 786 P.2d 1296 (1990) (finding no due process violation where state was required to prove facts by clear and convincing evidence, father was represented by counsel, father testified by telephone following adverse witnesses and responded to adverse evidence, father was able to consult with his counsel by telephone, counsel meaningfully cross-examined adverse witnesses and appellate review was de novo); *In Interest of Darrow*, 32 Wash.App. 803, 809, 649 P.2d 858, 861 (1982) (stating "[i]n those cases where the imprisoned parent's attendance cannot be procured safely and timely, the trial court should assure that the parent is afforded a full and fair opportunity to present evidence or rebut evidence presented against him," and concluding that father's due process rights were not violated by virtue of his absence at termination proceedings where he "was afforded a full opportunity to defend in a fair hearing while represented by counsel"). However, some courts have seemingly limited their analysis to situations where the incarcerated parent is confined in another state. *See In re Juvenile Appeal*, 187 Conn. 431, 446 A.2d 808 (1982) (providing tenuous guidance as to whether decision applied only to out-of-state prisoners); *In Interest of Baby Doe*, 130 Idaho 47, 936 P.2d 690 (1997) (same); *State ex rel. Children, Youth & Families Dep't v. Ruth Anne E.*, 126 N.M. 670, 974 P.2d 164 (1999) (limiting decision to out-of-state prisoners).

12. We recognize that this State's ability to achieve the appearance of a parent who is incarcerated in another state, assuming such appearance is appropriate, will require the consent and cooperation of that other state.

(1987), which involved an in-state prisoner and had the effect of "logically lead[ing] one to believe that a parent has an absolute right to be present at a severance hearing without regard to the particular circumstance in the individual case").[13]

Moreover, other jurisdictions have adopted similar rules in cases involving prisoners confined within the state. *See People in Interest of C.G.*, 885 P.2d 355, 357 (Colo.Ct.App. 1994) (rejecting state-incarcerated father's attempt to distinguish his case from one where parent was incarcerated out-of-state, and finding no due process violation where "a respondent has an opportunity to appear through counsel and is given an opportunity to present evidence and cross-examine witnesses through deposition or otherwise"); *In Interest of J.S.*, 470 N.W.2d 48, 52 (Iowa Ct.App.1991) (concluding, in case involving in-state incarcerated father, "[w]here a parent receives notice of the petition and hearing, is represented by counsel, counsel is present at the termination hearing, and the parent has an opportunity to present testimony by deposition, we cannot say the parent has been deprived of fundamental fairness" (citations omitted)); *In Interest of A.P.*, 692 A.2d 240, 243 (Pa.Super.Ct.1997) (finding state-incarcerated parent's due process rights were not violated where parent participated "[b]y way of a conference call, . . . was able to hear the testimony presented, testif[ied] in his own behalf, and confer[red] confidentially with his counsel"); *Najar v. Oman*, 624 S.W.2d 385, 387 (Tex.Ct. App.1981) (holding trial court did not abuse its discretion in denying a bench warrant that would have allowed in-state incarcerated parent to be present at termination proceedings where parent "was represented by counsel," and where "[c]ounsel cross-examined [opposing party's] witnesses and was given the opportunity to present evidence").

Finally, we note that the question of whether an incarcerated parent may appear at a dispositional hearing is within the discretion of the circuit court. *See* Syl. pt. 3, in part, *Craigo v. Marshall,* 175 W.Va. 72, 331

S.E.2d 510 (1985) ("Whether a prisoner may appear at trial is a matter committed to the sound discretion of the trial court."). *See also In re Heller,* 669 A.2d 25, 32 (Del.1995) (" 'If a parent has been afforded procedural due process for a hearing to terminate parental rights, allowing a parent who is incarcerated or otherwise confined in custody of a government to attend the termination hearing is within the discretion of the trial court.' " (citation omitted)); Syl. pt. 5, *In re Interest of L.V.,* 240 Neb. 404, 482 N.W.2d 250 ("If a parent has been afforded procedural due process for a hearing to terminate parental rights, allowing a parent who is incarcerated or otherwise confined in custody of a government to attend the termination hearing is within the discretion of the trial court, whose decision on appeal will be upheld in the absence of an abuse of discretion."); *In Interest of F.H.,* 283 N.W.2d 202, 209 (N.D.1979) ("Any right to appear personally would have to rest upon convincing reasons and would ultimately be left to the sound discretion of the trial court."); *Najar v. Oman,* 624 S.W.2d 385 (holding trial court did not abuse its discretion in denying a bench warrant that would have allowed in-state incarcerated parent to be present at termination proceedings).

After thoughtfully considering the above-discussed authority, we first hold that whether an incarcerated parent may attend a dispositional hearing addressing the possible termination of his or her parental rights is a matter committed to the sound discretion of the circuit court. Next, we hold that in exercising its discretion to decide whether to permit an incarcerated parent to attend a dispositional hearing addressing the possible termination of his or her parental rights, regardless of the location of the institution wherein the parent is confined, the circuit court should balance the following factors: (1) the delay resulting from parental attendance; (2) the need for an early determination of the matter; (3) the elapsed time during which the proceeding has been pend-

---

**13.** At least one jurisdiction has statutorily granted an absolute right to appear at termination proceedings to parents who are incarcerated in certain specified facilities within the state, *e.g .,* state prison, county jail, etc. *See* Cal.Penal Code § 2625 (1996) (West's Supp.2000); *In re Gary U.,* 136 Cal.App.3d 494, 186 Cal.Rptr. 316 (1982) (discussing Cal.Penal Code § 2625).

ing before the circuit court; (4) the best interests of the child(ren) in reference to the parent's physical attendance at the termination hearing; (5) the reasonable availability of the parent's testimony through a means other than his or her attendance at the hearing; (6) the interests of the incarcerated parent in presenting his or her testimony in person rather than by alternate means; (7) the affect of the parent's presence and personal participation in the proceedings upon the probability of his or her ultimate success on the merits; (8) the cost and inconvenience of transporting a parent from his or her place of incarceration to the courtroom; (9) any potential danger or security risk which may accompany the incarcerated parent's transportation to or presence at the proceedings; (10) the inconvenience or detriment to parties or witnesses; and (11) any other relevant factors.

In the case at bar, Jeanette H. has filed a motion to dismiss stating that she has been released on parol. Consequently, a writ of prohibition to prevent the enforcement of Judge Pancake's ruling is no longer necessary, and the writ of prohibition is dismissed.

## V.

## CONCLUSION

For the reasons explained in the body of this opinion, the writ of prohibition is dismissed.

Writ Dismissed.