# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 17 2016, 8:31 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Adam G. Forrest
Andrew J. Sickmann
Boston Bever Klinge Cross & Chidester
Richmond, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

C.B. & K.B. (Minor Children)

and

A.M. (Mother) & D.B. (Father)

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

March 17, 2016

Court of Appeals Case No. 81A04-1508-JT-1117

Appeal from the Union Circuit Court

The Honorable Matthew R. Cox, Judge

Trial Court Cause Nos.
81C01-1412-JT-94
81C01-1412-JT-95

**Bailey, Judge.**

# Case Summary

[1] A.M. ("Mother") and D.B. ("Father") (collectively, "Parents") appeal the termination of their parental rights upon the petition of the Union County Department of Child Services ("DCS"). We affirm.

# Issues

[2] Father presents one issue for our review, which we restate as: whether the trial court abused its discretion and denied Father due process by ordering him to participate in the termination hearings via telephone, rather than transporting him from the Indiana Department of Correction ("the DOC").

[3] Mother presents one issue with three sub-issues, which we restate as: whether DCS established, by clear and convincing evidence, the requisite statutory elements to support the termination decision.

# Facts and Procedural History

[4] Mother has two children: K.B. and C.B. (collectively, "Children"). Father is the father of C.B. only.[1] Prior to DCS's involvement, Children lived with Mother, and Father did not regularly supervise or have contact with C.B.

[5] On August 2, 2013, DCS received a report that Mother had been arrested in Butler County, Ohio, on charges of possession of heroin and tampering with evidence. Mother bonded out a few days later. On August 19, 2013, DCS was notified that five-year-old C.B. had run away from school. C.B. was found hiding outside Mother's residence, but neither parent could be located. Later that day, Mother failed to pick up Children from school. DCS took Children into custody and placed them in their maternal grandmother and step-grandfather's care. Mother later admitted that she was using heroin daily at that time.

[6] DCS filed verified petitions alleging that Children were Children in Need of Services ("CHINS") because Mother failed to supervise Children, Mother's drug use was interfering with her ability to care for them, and, in the case of C.B., Father could not be located. Children were adjudicated CHINS on August 27, 2013, after Mother admitted to the allegations. On September 13,

---

[1] K.B.'s father is deceased.

2013, the court entered dispositional decrees as to Mother, ordering her to, among other conditions, refrain from illegal drug use, successfully complete inpatient substance abuse treatment, submit to random drug screens, attend all scheduled visitations with Children, and participate in home-based services. Father was eventually located in the Union County Jail, where he had been confined since late November 2013 on charges of theft and burglary.

[7]   Mother continued to use illegal drugs, failed to attend inpatient drug treatment, was convicted in the possession/tampering case, accrued new criminal charges of theft, was intermittently jailed, and in October 2014 was incarcerated in the Ohio Department of Rehabilitation and Correction ("the DRC") after she was found to have violated the terms of her probation. Father remained incarcerated throughout 2014. On December 18, 2014, DCS filed verified petitions to involuntarily terminate Parents' parental rights.

[8]   Father filed a motion for transport, requesting that he be transported from the Plainfield Correctional Facility ("PCF") to Union County. His motion was denied, and the court ordered that he participate via telephone. The trial court held a fact-finding hearing on the petitions on March 3, 2015, while Father was incarcerated and Mother was residing in a halfway house under the supervision of the DRC. After DCS rested its case, the hearing was continued until May 12, 2015. By that time, Mother had been released and appeared in person. Father's second motion for transport was denied and he again appeared by phone. On July 13, 2015, the trial court entered orders terminating Parents' parental rights. Parents now appeal.

# Discussion and Decision

[9] Our standard of review is highly deferential in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). This Court will not set aside the trial court's judgment terminating a parent-child relationship unless it is clearly erroneous. *In re A.A.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997). Parental rights are of a constitutional dimension, but the law provides for the termination of those rights when the parents are unable or unwilling to meet their parental responsibilities. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish parents, but to protect their children. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

### *Father's Contentions*

[10] We begin with Father's contention that he was denied due process because the trial court denied his motions for transport. "'The Due Process Clause of the U.S. Constitution and the Due Course of Law Clause of the Indiana Constitution prohibit state action that deprives a person of life, liberty, or property without a fair proceeding.'" *In re C.G.*, 954 N.E.2d 910, 916 (Ind. 2011) (quoting *In re Paternity of M.G.S.*, 756 N.E.2d 990, 1004 (Ind. Ct. App. 2001), *trans. denied*). Thus when the State seeks to terminate the parent-child relationship, it must do so in a way that meets the requirements of due process. *Id.* at 917. The process due in a termination proceeding turns on the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing

governmental interest supporting use of the challenged procedure. *Id.* Although due process is not dependent on the underlying facts of the particular case, the balancing test recognizes that due process is flexible and calls for such procedural protections as the particular situation demands. *Id.* (quotation marks and citation omitted).

[11] Indiana courts have held that a parent has no absolute right to be present at a termination hearing. *Id.* at 921. Whether an incarcerated parent is permitted to attend a termination of parental rights hearing is within the sound discretion of the trial court. *Id.* at 922. In exercising this discretion,

> the trial court judge should balance the following factors: (1) The delay resulting from parental attendance; (2) the need for an early determination of the matter; (3) the elapsed time during which the proceeding has been pending; (4) the best interests of the child(ren) in reference to the parent's physical attendance at the termination hearing; (5) the reasonable availability of the parent's testimony through a means other than his or her attendance at the hearing; (6) the interests of the incarcerated parent in presenting his or her testimony in person rather than by alternate means; (7) the affect [sic] of the parent's presence and personal participation in the proceedings upon the probability of his or her ultimate success on the merits; (8) the cost and inconvenience of transporting a parent from his or her place of incarceration to the courtroom; (9) any potential danger or security risk which may accompany the incarcerated parent's transportation to or presence at the proceedings; (10) the inconvenience or detriment to parties or witnesses; and (11) any other relevant factors.

*Id.* at 922-23 (quoting *State ex rel. Jeanette H. v. Pancake*, 529 S.E.2d 865, 877-78 (W. Va. 2000)) (footnote omitted).

[12] Father argues that the court's denials of his motions for transport were an abuse of discretion because the court "offered no real perspective relating to the eleven (11) factors to be balanced in exercising its discretion . . . ." (Appellant-Father's Br. 9.) However, the trial court acknowledged that it was exercising its discretion in light of the test annunciated in *C.G.*, specifically explaining that it denied the motions "due to the logistics of transporting both parents from prison[.]" (Tr. 17.) Father then seeks to distinguish *C.G.* because the parent in that case was imprisoned in another state whereas Father was incarcerated in Indiana. The test in *C.G.* mandates that a trial court take into consideration "the cost and inconvenience of transporting a parent from his or her place of incarceration to the courtroom[,]" *In re C.G.*, 954 N.E.2d at 923, and is not limited to interstate transportation. As the trial court explained at the March 3, 2015 fact-finding hearing, the court's previous efforts to transport Father from PCF for the initial hearing imposed "a burden on the Sheriff's Department to make that happen." (Tr. 17.) The trial court did not abuse its discretion when it considered, based on prior experience, the difficulty of transporting Father nearly 100 miles across the State.

[13] Furthermore, as in *C.G.*, the court implemented several procedural safeguards to protect Father's due process rights. Father was represented by counsel throughout the case. At the hearings, the court repeatedly asked if Father could hear and several times paused to explain the courtroom proceedings to Father. When Father had difficulty hearing due to a poor phone connection on March 3, the court made adjustments and reminded counsel and witnesses to move

closer to the phone and speak more loudly. On Parents' motions, the trial was bifurcated prior to Parents presenting their defenses. As the court observed, this gave Parents' counsel "additional time to talk with their clients" and obtain evidence from the DOC. (Tr. 81.)

[14] In light of the trial court's consideration of the test annunciated in *C.G.* and the safeguards employed, we cannot say the trial court denied Father due process by denying his motions for transport and ordering him to appear via phone.

### Mother's Contentions

[15] We turn now to Mother's contention that there was insufficient evidence to support the termination order. When reviewing the sufficiency of the evidence to support a judgment of involuntary termination of a parent-child relationship, we neither reweigh the evidence nor judge the credibility of the witnesses. *A.A.C.*, 682 N.E.2d at 544. We consider only the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. *Id.* When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester*, 839 N.E.2d at 147. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* A judgment is clearly erroneous if the findings do not support the court's conclusions or the conclusions do not support the judgment. *Id.*

Indiana Code section 31-35-2-4(b)(2) sets out the elements that DCS must allege and prove by clear and convincing evidence in order to terminate a parent-child relationship:

> (A)     that one (1) of the following is true:
>
>> (i)      The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii)     A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>>
>> (iii)    The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B)     that one (1) of the following is true:
>
>> (i)      There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii)     There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)    that termination is in the best interests of the child; and
>
> (D)    that there is a satisfactory plan for the care and treatment of the child.

If the court finds that the allegations in a petition described above are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[17] Mother does not challenge the court's determinations under Indiana Code section 31-35-2-4(b)(2)(A), but raises challenges under Sections (b)(2)(B), (C), and (D). We begin with Section (b)(2)(B), where Mother raises objections under both subsections (i) and (ii). Section 31-35-2-4(b)(2)(B) is written in the disjunctive, and therefore the court need only find that one of the three requirements of Section (b)(2)(B) has been established by clear and convincing evidence. *See L.S.*, 717 N.E.2d at 209. Because we find it dispositive under the facts of this case, we review only whether DCS established, by clear and convincing evidence, that there is a reasonable probability that the conditions that resulted Children's removal will not be remedied.[2] *See* I.C. § 31-35-2-4(b)(2)(B)(i).

---

[2] Although neither Mother nor the State advance arguments as to subsection (b)(2)(B)(iii) (two separate CHINS adjudications), there is evidence to suggest that the "relaxed" burden of proof established by subsection (iii) was met here. *See In re S.D.*, 2 N.E.3d 1283, 1290 (Ind. 2014) (observing "a CHINS finding can relax the State's burden for terminating parental rights" because under subsection (iii), the State may terminate parental rights if a child has been adjudicated CHINS on two prior occasions without proving the

[18] We engage in a two-step analysis to determine whether the conditions that led to Children's placement outside of Mother's home likely will not be remedied. *In re K.T.K.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we ascertain what conditions led to their placement outside the home, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In making these decisions, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). However, the court must balance any recent improvements against a parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id.*

[19] Mother first challenges the court's finding that she failed to complete substance abuse treatment, arguing that the "evidence presented at the fact-finding hearing directly contradicts this finding." (Appellant-Mother's Br. 14.) Mother points to her testimony that she participated in several programs and counseling while residing in a halfway house under the supervision of the DRC. However,

---

elements of subsections (b)(2)(B)(i) or (ii)). At the hearing, the trial court took judicial notice of "previous CHINS cases involving this family." (Tr. 23.) Then, in each termination order, the trial court found "Child was previously adjudicated a Child in Need of Services in June 2010 in a case that closed in January 2012[.]" (Mother's App. 25, 65.) Mother does not challenge these findings. However, as DCS observes in a footnote, the documents concerning these cases are not in the appellate record. This hampers our review of the issue, and we accordingly address the arguments related to subsection (b)(2)(B)(i).

her testimony does not establish that she completed any substance abuse treatment or other program, as opposed to simply being released at the end of her sentence. She also testified she did not attend the DRC's intensive drug program "because they have a waiting list and the short time that I was there I never made it in." (Tr. 99.) The court's finding that Mother did not complete substance abuse treatment was not clearly erroneous.

[20] Noting her sobriety during incarceration in the DRC, Mother next argues that the "trial court should not simply presume that the conditions that led to the removal of [her] children would not be remedied because she once suffered from drug addiction." (Appellant-Mother's Br. 13.) DCS first became involved with Mother and Children in 2010 due to Mother's drug use. Children then were removed from Mother's home in 2013 and adjudicated CHINS after Mother admitted her daily drug use was interfering with her ability to care for Children. After Children were removed, Mother continued to use heroin regularly and refused inpatient drug abuse treatment. Mother did not participate in other services offered by DCS and did not gain or maintain stable employment or housing. Mother's visitation with Children remained supervised because she appeared to be under the influence of drugs during some of the visits. Mother completely stopped visiting Children in December 2013. Mother was jailed sporadically in 2014 and continuously incarcerated in Ohio from September 2014 until her release from the halfway house in April 2015.

[21] Although the court observed that "Mother's recent release from incarceration raises the possibility that she might be able to provide a suitable home to the

children given enough time" (Mother's App. 28, 67), the trial court had discretion to weigh Mother's "cycle of incarceration and relapse into substance abuse" (Mother's App. 26, 66) and "historic inability to provide a suitable environment for her children" (Mother's App. 28, 68) more heavily than any efforts made shortly before termination. *See E.M.*, 4 N.E.3d at 643. The trial court's finding that there was reasonable probability the conditions that resulted in Children's removal from Mother's home would not be remedied was not clearly erroneous.

[22] Mother next contends that there was insufficient evidence to support the trial court's conclusion that termination is in Children's best interests. *See* I.C. § 31-35-2-4(b)(2)(C).[3] In determining the best interests of a child, the trial court must look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 289-90 (Ind. Ct. App. 2013), *reh'g denied*. In doing so, the court must subordinate the interests of the parent to those of the child. *Id.* at 290. The trial court need not wait until a child is harmed irreversibly before terminating the parent-child relationship. *Id.* Further, a parent's historical and current inability to provide a suitable environment supports finding termination of parental rights is in a child's best interests. *Id.*

---

[3] The State contends that Mother "does not develop an argument challenging [the court's 'best interests' conclusion] in her brief" (Appellee's Br. 28), presumes Mother waived the issue, and presents no arguments in response. Although Mother intertwines her Section (b)(2)(C) argument regarding best interest with her subsection (b)(2)(B)(ii) argument concerning the threat to Children's well-being, Mother cites the appropriate standard on best interests and presents related argument. Accordingly, we address Mother's contentions.

[23] Mother first challenges one of the court's best interests findings: that Mother was unemployed "and in fact left employment because she 'didn't like it.'" (Mother's App. 28, 68.) At trial, Mother testified she obtained employment while at the halfway house, but did not stay there "[b]ecause I don't know anybody up there and I…I just…I didn't want to. I don't like Cincinnati." (Tr. 121.) Since returning to Indiana, Mother had not obtained employment. Where Mother testified she voluntarily left employment in a city she disliked, the court's finding regarding her employment status was not clearly erroneous.

[24] Mother next argues there was insufficient evidence that termination was in Children's best interest because K.B.'s Court-Appointed Special Advocate ("CASA") advocated for guardianship, rather than adoption, as being in K.B.'s best interests. CASA also submitted a report summarizing the negative emotional impact the termination proceedings had on then twelve-year-old K.B. Mother argues the "trial court should have provided greater weight to CASA's report and testimony." (Appellant-Mother's Br. 17.) However, this argument is a blatant request to reweigh the evidence, which this Court will not do. *See A.A.C.*, 682 N.E.2d at 544. In light of the totality of the evidence discussed above regarding Mother's historical and current inability to provide for Children, the trial court's finding that termination was in Children's best interests was not clearly erroneous.

[25] Lastly, Mother argues that DCS did not present a satisfactory plan for the care and treatment of Children. *See* I.C. § 31-35-2-4(b)(2)(D). DCS's plan for Children was adoption by maternal grandmother. Mother argues the plan is

insufficient because CASA disagreed with adoption for K.B., instead advocating for guardianship. However, under subsection (D), a plan for the care and treatment of a child "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*. DCS's plan to place Children with grandmother, with whom they have lived since removal from Mother's home, was satisfactory.

# Conclusion

[26] The trial court did not deny Father due process by denying Father's motions for transport and ordering Father to appear by telephone. In addition, DCS established, by clear and convincing evidence, the requisite elements of Indiana Code section 31-35-2-4(b)(2). Accordingly, the court's judgment of involuntary termination of the parent-child relationship was not clearly erroneous.

[27] Affirmed.

Vaidik, C.J., and Crone, J., concur.